871 F.2d 241
 Anatol KOZLOWSKI, James Sims, and Donna Kozlowski,
Plaintiffs-Appellees,
v.
Thomas A. COUGHLIN, III, Commissioner of the New York State
Department of Correctional Services, Theodore D.
Reid, Superintendent, Fishkill
Correctional Facility, and
Charles Scully, Defendants,
Thomas A. Coughlin, III, Commissioner of the New York State
Department of Correctional Services, Defendant-Appellant.
 No. 634, Dockets 88-2319, 88-2429.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 12, 1989.
Decided March 17, 1989.
 
 Robert Selcov, Poughkeepsie, N.Y. (David C. Levin, Prisoners' Legal Services of New York, David Posner, McCabe & Mack, Poughkeepsie, New York City, of counsel), for plaintiffs-appellees.
 Jo Ann M. Becker, Asst. Atty. Gen., of the State of New York, New York City (Robert Abrams, Atty. Gen. of the State of New York, New York City, of counsel), for defendant-appellant.
 Before KAUFMAN, VAN GRAAFEILAND, and MINER, Circuit Judges.
 
 KAUFMAN, IRVING R. Circuit Judge:
 
 1
 Penal institutions operated by the New York State Department of Correctional Services (the Commissioner or DOCS) provide inmates the opportunity to maintain tangible and healthy relationships with friends and family beyond the prison gates via a program of supervised visitation. Indeed, the New York State Constitution recognizes that inmates in New York have a fundamental right to maintain these bonds. See Cooper v. Morin, 49 N.Y.2d 69, 79-83, 399 N.E.2d 1188, 1194-95, 424 N.Y.S.2d 168, 174-76 (1979), cert. denied, 446 U.S. 984, 100 S.Ct. 2965, 64 L.Ed.2d 840 (1980).
 
 
 2
 Designed to preserve the rehabilitative benefits that accrue from such contact, a 1983 consent decree controls the circumstances under which the Commissioner may suspend or terminate visitation privileges. This remedial decree was entered in lieu of a trial, by Judge Charles E. Stewart, Jr., after he held that New York violated the liberty prong of the 14th amendment by failing to provide pre-revocation process prior to curtailing visiting privileges. Kozlowski v. Coughlin, 539 F.Supp. 852 (S.D.N.Y.1982). The Commissioner now seeks to modify the decree, contending that more restrictive sanctions are necessary to maintain security and curb rising drug abuse in New York's state prisons.
 
 
 3
 He asserts that since the penalties--unlike the procedures--in the decree are unrelated to the underlying due process violation, the eleventh amendment bars subject matter jurisdiction. Alternatively, he urges that Judge Stewart abused his discretion by denying a majority of the requested modifications. We disagree; the sanctions are a vital part of the decree designed to remedy the constitutional violation and the Commissioner adduced insufficient evidence to justify further modification. Accordingly, we affirm.
 
 
 4
 In 1981, appellees brought two class action suits against the Commissioner pursuant to 42 U.S.C. Sec. 1983 (1982)--one on behalf of all inmates in New York State prisons, the other representing all potential visitors--asserting there was an absence of pre-revocation procedures prior to the suspension or termination of visitation privileges. The cases were consolidated and Judge Stewart ruled that a state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights. Consequently, New York's then existing system violated the dictates of procedural due process. Kozlowski v. Coughlin, 539 F.Supp. 852 (S.D.N.Y.1982). Subsequently, the parties avoided the next step in this type of litigation--a trial to determine what "due process" pursuant to the Constitution is required, see, e.g., Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982)--by negotiating remedial procedures and sanctions which the district court entered as a consent judgment in May 1983.
 
 
 5
 Codified with minor modifications at N.Y.Comp.Code R. & Regs. tit. 7, Secs. 200.1-200.5 (1988), the decree detailed the procedures New York state officials must follow before suspending or revoking an inmate's visitation rights. It specifically set forth the sanctions the Commissioner can impose for particular offenses. See id. Sec. 200.5. As the district court stated, and the parties before us agree, "The process due was linked to the severity of the proposed sanction, i.e., the longer the threatened suspension of visitation privileges, the greater the procedures that would be afforded...."
 
 
 6
 Two basic penal principles dictated the structure and format of the decree. First and foremost, the decree recognized, and sought to maintain, the rehabilitative benefits of visitation. It stated that "[t]he inmate visitor program is intended to provide inmates ... with an opportunity to maintain relationships with friends and relatives in order to promote better community adjustment upon release." N.Y.Comp.Code R. & Regs. tit. 7, Sec. 200.1 (1988). Secondly, visitation sanctions may not be employed to punish or discipline. Consequently, only misconduct between an inmate and a specific visitor can result in deprivation of visitation rights.[1] As the decree implicitly recognizes, the link between visitation, rehabilitation, and prison security is more than tenuous. Not only has it been empirically demonstrated that preserving external relationships is a prerequisite to successful parole, see, e.g., Commissioner [of the New York State Department of Correctional Services'] Task Force on Visiting, Final Report 2 (1984) (" '[T]he consensus of findings, should be emphasized.... It is doubtful if there is any other research finding in the field of corrections which can come close to this record.' ") (quoting E. Homer, "Inmate Family Ties: Desirable but Difficult," Federal Probation, Mar. 1979, at 47, 49), but visitation is also "an invaluable aid to safe and secure facility environments." Id. at ii (Letter from members of the Task Force to Commissioner Coughlin presenting Final Report).
 
 
 7
 After operating for five years under the decree, the Commissioner alleged that "the list of types of misconduct was incomplete, that the sanctions were not strict enough in some areas, and that the sanctions were too rigid and allowed no discretion in some cases." In particular, he pointed to the need to combat a "burgeoning 'crack' epidemic" within state prisons as the primary justification for the proposed modifications. Drugs find their way into penal facilities through three sources: packages, dishonest prison employees, and contact visits. The Commissioner claimed that despite his "best efforts," to address each area, the problem of rising abuse persisted. See Joint Appendix at 116 (Affidavit of the Deputy Commissioner for Facility Operations Philip Coombe). Consequently, in 1988, he sought to remove the sanctions tables from the decree or modify them radically.
 
 
 8
 To eliminate the sanctions portion of the decree, or gain the freedom to modify at will, the Commissioner argued before Judge Stewart that because the sanctions were not mandated by any provision of the United States Constitution, the court lacked the power to enforce that portion of the consent judgment. To do so, he claimed, would violate the 11th amendment as interpreted in Pennhurst State School v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), which prohibited a federal court from imposing injunctive relief against state officials for violations of state law. Ruling that the sanctions "sprang directly from our finding of a constitutional violation," and as such were "deeply rooted in federal law," Judge Stewart rejected the eleventh amendment claim. 711 F.Supp. 83.
 
 
 9
 As summarized below, the Commissioner's Rule 60(b) motion proposed to:
 
 
 10
 1) Increase the length of suspension for drug-related visitor-inmate misconduct.
 
 
 11
 2) Provide for suspension of all contact visits for inmates found guilty in a disciplinary hearing of drug-related misconduct not specifically related to a particular visitor.
 
 
 12
 3) Allow limitation, suspension, or revocation of an inmate's visiting privileges for misconduct not related to a specific visitor, but related to visiting generally.
 
 
 13
 4) Grant discretion to DOCS to impose greater penalties in certain "extraordinary" cases where such an increased sanction may be warranted.
 
 
 14
 5) Provide for the cumulation of sanctions in the case of repeated inmate abuse of visiting privileges.
 
 
 15
 6) Eliminate the present requirement that an inmate can lose visitation privileges only with regard to one specific visitor.
 
 
 16
 7) Add sanctions for misconduct not currently enumerated but which would constitute violations of the penal law.
 
 
 17
 Judge Stewart viewed many of the modifications proposed as an attempt "to broaden the intentionally limited scope of the negotiated decree," rather than to remedy deficiencies in the decree. He found that while the evidence submitted did indicate a need for greater deterrence, it was insufficient to support the modifications in the decree's underlying penal philosophy that the Commissioner sought. Accordingly, the district court granted only those requests consistent with the underlying scheme. The Commissioner was permitted to 1) cumulate sanctions for different acts of misconduct between an inmate and a particular visitor and 2) enhance sanctions for those drug-related offenses previously enumerated in the decree. This latter modification is of particular significance. The penalty for the first instance of intentional smuggling of narcotic and other dangerous drugs during a visit was increased from a one year suspension of visitation rights to a complete revocation of those rights.
 
 
 18
 The Commissioner would have us synthesize several related arguments into the following rule. He urges that absent a proper waiver of eleventh amendment immunity, a federal court cannot enforce a previously entered consent judgment against a state when the decree requires action that cannot be reasonably interpreted as enforcing guarantees arising from the Constitution.[2] Applying this formulation, the Commissioner presses, as he did in the district court, the claim that the eleventh amendment bars subject matter jurisdiction because the sanctions portion of the decree is not mandated by the Constitution. At best, he asserts, the sanctions "merely serve to facilitate application of the procedures embodied in the consent decree." Consequently, the Commissioner insists he possesses the ability to alter the sanctions portion of the decree without court approval.
 
 
 19
 As the court below correctly noted, Local Number 93, International Association of Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (hereinafter Firefighters ), enunciated the standards controlling a court's authority to enter a consent decree. In essence, the rule the Commissioner posits distinguishes, for eleventh amendment purposes, between a court's power to enter, and its ability to enforce, a consent judgment. The language in a recent Fifth Circuit opinion, upon which the Commissioner relies, suggests that although Firefighters "addressed the entry of a consent decree.... [i]t does not enlarge the court's latitude to issue its own, different order enforcing or modifying the decree, for in that case we presume the court must fall back on its inherent jurisdiction." Lelsz v. Kavanagh, 807 F.2d 1243, 1252 (5th Cir.) (hereinafter Kavanagh ), reh'g and reh'g en banc denied, 815 F.2d 1034, cert. dismissed, --- U.S. ----, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987). In our view, however, the Commissioner's reliance is misplaced; the Firefighters opinion is consistent with the dictates of the Supreme Court's eleventh amendment jurisprudence, and the Kavanagh distinction is untenable. If a federal court can validly enter a consent decree, it can surely enforce that decree.
 
 
 20
 Before entering a consent judgment, the district court must be certain that the decree 1) "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction," 2) "come[s] within the general scope of the case made by the pleadings," and 3) "further[s] the objectives of the law upon which the complaint was based." Firefighters, 478 U.S. at 525, 106 S.Ct. at 3077 (citations omitted). These three conditions are sufficient even if the decree contains broader relief than the court could have awarded after trial. Id. We need look no further than this pronouncement to determine the propriety of both entering and enforcing a consent decree. See Note, "Federalism and Federal Consent Decrees Against State Governmental Entities," 88 Colum.L.Rev. 1796, 1809 (1988) (under Firefighters, "a federal court's remedial power is significantly broader when entering and enforcing a consent decree."). Indeed, the first Firefighters factor--whether the decree emanates from a dispute within the court's subject matter jurisdiction--encompasses the Kavanagh court's alleged distinction that the enforcement power somehow requires an independent assessment of "inherent jurisdiction."[3] Even if this were not so, by consenting to the decree, the Commissioner waived eleventh amendment immunity. See, e.g., New York State Association for Retarded Children, Inc. v. Carey, 596 F.2d 27, 39 (2d Cir.1979).
 
 
 21
 We agree with Judge Stewart that the decree at issue satisfies the Firefighters standard. Our review of the case leaves no doubt that the decree fell within the ambit of the pleadings, which objected to the lack of pre-revocation procedures in New York State prisons. Given the bifurcated structure of this type of litigation, determining the remedy would have been the next step. Judge Stewart also noted that his prior decision, finding a violation of the 14th amendment, "prompted" the parties to negotiate.
 
 
 22
 These facts also demonstrate that the decree springs from and serves to resolve the remaining dispute over what process was due appellees. As the court below found, discussions regarding the sanctions portion of the decree were integral to the consent decree negotiations and the litigation as a whole. Judge Stewart stated, "In order to ensure that the appropriate procedures were followed in connection with a given visitor-related offense, the parties negotiated and included in the consent decree the table of sanctions presently in dispute."[4]
 
 
 23
 Given the Commissioner's state affiliation, we must consider together the remaining questions regarding subject matter jurisdiction and the extent to which the decree furthers the goals of section 1983. As we have noted, the Firefighters' reference to subject matter jurisdiction anticipates any potential eleventh amendment enforcement concern. Just as satisfaction of this standard validates entering the decree in question, so too does it empower the court to enforce that decree. Judge Stewart's finding that the sanctions and procedures in the decree were inextricably intertwined indicates that the sanctions served to further the objectives of the underlying law--the procedural dictates of the fourteenth amendment. The question of how to remedy a violation of the fourteenth amendment in a section 1983 claim was thus within the court's subject-matter jurisdiction. And, of course the need to remedy the federal constitutional violation eliminates any potential conflict with the eleventh amendment. Where, as the district court correctly declared, the relief is "firmly rooted in federal law," principles of federalism and comity are not offended by a decree that reaches into what is otherwise the state's domain.
 
 
 24
 A second ground, which Judge Stewart noted, buttresses our conclusion. In Firefighters, the Supreme Court stated that a consent decree possesses a dual character, a "hybrid nature" that reflects attributes of both a contract and a judicial decree. 478 U.S. at 519, 106 S.Ct. at 3074. The judicial aspect of a consent decree derives from the imprimatur of the court, which invests the decree with the integrity of the judiciary and signifies the court's willingness to implement the solution of the parties. Consent decrees parallel contracts since "their terms are arrived at through mutual agreement of the parties." Id.[5] As the Supreme Court has noted, a decree's relation to a binding contract affects its enforceability: "[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree." Id. at 525, 106 S.Ct. at 3077. As Judge Stewart so aptly held, "Having entered into the consent decree rather than bringing the dispute [over remedies] to trial, [the Commissioner] cannot now evade an integral portion of that decree on the ground that it was not directly tied to a federal claim." Such a result would impugn the integrity of the court and allow the Commissioner to avoid his bargained-for obligations--while retaining the benefits of concessions he obtained on other issues during the negotiations.[6]
 
 
 25
 We now approach the effect of a Rule 60(b) motion. When considering the Rule, a court "must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality." Kotlicky v. United States Fidelity & Guaranty Co., 817 F.2d 6, 9 (2d Cir.1987). This balance is delicate indeed. By placing excessive emphasis on the need for finality, thus erecting barriers to equitable relief, the court risks chilling settlement incentives. See Note, "The Modification of Consent Decrees in Institutional Reform Litigation," 99 Harv.L.Rev. 1020, 1029 n. 56 (1986) (hereinafter "Modification"). The exercise of equity, however, does not permit a court to indulge a party's discontent over the effects of its bargain. See Nemaizer v. Baker, 793 F.2d 58, 60 (2d Cir.1986) ("[A]n argument based on hindsight is not a ground upon which a court may grant Rule 60(b) relief.").
 
 
 26
 Federal Rule of Civil Procedure 60(b)(5) authorizes a court to "relieve a party ... from a final judgment ... [if] it is no longer equitable that the judgment should have prospective application." In the realm of consent decree modifications, the Supreme Court has spoken with diverging voices. The opinions of such Justices as Cardozo and Frankfurter reveal that "[t]he power ... to modify a decree of injunctive relief is long-established, broad and flexible." New York State Association for Retarded Children, Inc. v. Carey, 706 F.2d 956, 967 (2d Cir.1983) (hereinafter Association for Retarded Children ) (citing United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (Cardozo, J.); Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 298, 61 S.Ct. 552, 557, 85 L.Ed. 836 (1941) (Frankfurter, J.)). Yet the arduous standard promulgated by Justice Cardozo in United States v. Swift, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (hereinafter Swift ), assured that, initially, few modifications would occur.
 
 
 27
 Ruling on whether a 1920 consent decree that prohibited five major meat packers from entering other food stuff markets should be modified in light of changed circumstances, Benjamin Cardozo stated:
 
 
 28
 The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.
 
 
 29
 Swift, 286 U.S. at 119, 52 S.Ct. at 464. This complex analysis contains many strands that still shape the contours of the doctrine. Cardozo warned, for example, of the need to ensure that more than hindsight motivates the motion. Though courts and scholars deemed the primary import of his words to be acceptance of a high degree of harm before allowing modification of a decree,[7] a stance which emphasized the value of finality, he also examined whether the circumstances that lead to the negotiation of the decree persisted. Cast in a more current idiom, Cardozo articulated the need to examine whether or not the decree had served its purpose. But this element remained submerged for 36 years, and only began its journey to the fore when the Court revisited the modification question in United States v. United Shoe Machinery, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (hereinafter United Shoe ).
 
 
 30
 Again, in the antitrust context, the Court approved government-sponsored modifications designed to implement a litigated, not a consent, decree more effectively. Eschewing what Judge Friendly later described as "a rigidity the [Swift ] Court did not intend," King-Seeley Thermos Co. v. Aladdin Industries, Inc., 418 F.2d 31, 34 (2d Cir.1969) (hereinafter King-Seeley ), Justice Fortas, for a unanimous Court, reordered the Swift priorities. Stating that Cardozo's forceful language merely reflected the meat packer's improper attempt to avoid the obligations of the decree, United Shoe, 391 U.S. at 249, 88 S.Ct. at 1499, he wrote:
 
 
 31
 Swift teaches that a decree may be changed upon an appropriate showing, and it holds that it may not be changed in the interest of the defendants if the purposes of the litigation, as incorporated in the decree ... have not been fully achieved.
 
 
 32
 Id. at 248, 88 S.Ct. at 1499. Though some continue to argue that the United Shoe holding applies only to litigated decrees, see Note, "Modification," 99 Harv.L.Rev. at 1024-25 & n. 33, 1028-29, Judge Friendly committed us to the broader interpretation. King-Seeley, 418 F.2d at 34-35.
 
 
 33
 The ensuing 20 years, which witnessed the growing use of consent decrees to resolve institutional reform litigation such as in the case before us, have shown the prescience of that choice. Aside from the well-known virtue of saving time and expense for all concerned, consent decrees allow the parties to resolve intricate questions of institutional structure, issues that are perhaps best decided by those with greater expertise than judges possess, and offer an efficient enforcement and oversight mechanism. See generally Firefighters, 478 U.S. at 523 n. 13, 106 S.Ct. at 3076 n. 13; Schwarzschild, "Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform," 1984 Duke L.J. 887, 898-901.
 
 
 34
 Surveying the spate of law review commentary spawned by this new form of litigation, Judge Friendly concluded, fifteen years after United Shoe, "As experience with this type of litigation increases, a consensus is emerging among commentators in favor of modification with a rather free hand." Association for Retarded Children, 706 F.2d at 970. Much of the concern in the literature stemmed from the need to refine the decree by applying the lessons of experience to further the goals of the decree. The subjects of reform--often prisons, mental institutions and school systems--present institutional structures that require ongoing judicial supervision. In determining when, in institutional reform litigation, to modify an existing decree, the court must ascertain whether the moving party met its burden of demonstrating that "the modification was essential to attaining th[e] goal" of the decree. Id. at 969. Especially in a case where the movant does not act "in derogation of the primary objective of the decree" and the "case involves drawing the line between legitimate interests on each side," id., flexibility should be the key to the solution. We recently stated, "[M]odification is favored when necessary to carry out the purposes of the original decree." Badgley v. Santacroce, 853 F.2d 50, 53 (2d Cir.1988). The analysis must identify the essential purpose or purposes of the decree in question, and weigh the impact of the proposed modification on that ultimate objective.[8]
 
 
 35
 The primary purpose of the Kozlowski consent judgment was to remedy then existing due process violations. To do so--and preserve the rehabilitative effects of visitation--the decree's delineation, as discussed above, of the procedures and corresponding sanctions was narrow. A clear example is that it permitted suspension or termination of visitation only for infractions between the inmate and the visitor involved in the incident. In general, punishment and discipline were to be maintained through means other than visitation sanctions. Judge Stewart characterized the Commissioner's proposed modifications, many of which would allow "broader use of visitation sanctions ... [to] promote prison discipline and security," as an attempt "to broaden the intentionally limited scope of the negotiated decree." This effect alone, however, is insufficient to defeat modification. We have recognized that any justifiable modification "will perforce alter some aspect of the decree." Association for Retarded Children, 706 F.2d at 969.
 
 
 36
 In our view, this is not a case like Swift; here grave security concerns are alleged as the necessity for altering the decree. The instant proposal also presents a situation slightly different from Association for Retarded Children because here a facially legitimate ground for modification would result in changes that run counter to the prior agreement of the parties.[9] But while accommodating the maintenance of prison security by flexibly responding to changed conditions, we must strive to preserve the negotiated goals of a decree. To alter the current equation, the Commissioner bears the burden of clearly showing that quantum of necessity needed to convince us of the need for action. This done, he must also show that each change prunes the decree deftly, changing only as much as is required and leaving the ability to obtain the ultimate goal intact.
 
 
 37
 As we have stated, the Commissioner's complaints regarding the decree note the potential for chronic abuse of visitation privileges because an inmate can engage in a series of separate acts of misconduct with different visitors while receiving only first offense sanctions. Yet not a single occurrence is cited--not to mention credible statistics--to document this problem. Nor does the Commissioner present any evidence of efforts made to alleviate this and the other alleged shortcomings by methods that would leave the decree's underlying penal philosophy in place.[10] Solely on the basis of undisclosed anecdotal complaints by prison officials, the Commissioner seeks to discipline visit-related misconduct by limiting visitation rights. In addition, while the Commissioner's modification request rests primarily on the need to curb the growing epidemic of drug abuse in its prisons, he has made no attempt to link this problem with these other shortcomings. How, for example, would the imposition of a visitation sanction upon an inmate who engages in a fight with another prisoner in the visiting area combat the influx of drugs into the facility?
 
 
 38
 With regard to the drug abuse itself, the court is not unaware of the gravity of this problem and would applaud any appropriate effort to confront it. The Commissioner's proof of the problem's extent, the sources of the contraband and especially the connection between curbing visitation and solving that problem is simply inadequate. The district court correctly found that the evidence indicates little more than the existence of a drug problem and a risk in drug-related convictions. Numerous statistical and logical connections are missing.
 
 
 39
 Contrary to the assertion by the dissenting opinion, it is far from "superfluous" for the Commissioner to have reported on changes in prison conditions. Indeed, it is the heart of our function acting as appellate judges to pass on the sufficiency of the evidence supporting a modification. The Commissioner's proof certainly does not justify a remand for an evidentiary hearing--a proceeding which he never requested. Judge Miner also leaves the erroneous impression that the Commissioner was never heard in this matter. The district court heard oral argument from all counsel prior to rendering its decision.
 
 
 40
 Much is made in the dissent of the 2,000 drug-related misbehavior reports issued in 1987. This fact, however, merely raises questions of the sort that the Commissioner's evidence constantly leaves unanswered. Indeed, given the rising prison population, does this number represent a percentage or even a numerical increase since 1983? More importantly, contrary to Judge Miner's unfounded view, not a shred of evidence establishes that smuggling during prison visits accounts for a large increase in prison drug trafficking.
 
 
 41
 Judge Stewart concluded that appellants "have adequate means at their disposal for punishing misconduct without having to resort to an expanded use of the visitation penalty." We have carefully reviewed the record and agree with Judge Stewart's decision. Accordingly, we affirm.[11]
 
 VAN GRAAFEILAND, Circuit Judge, concurring:
 
 42
 Although I share completely Judge Miner's concern over the seriousness of the drug problem in our prisons, see Security and Law Enforcement Employees v. Carey, 737 F.2d 187, 211-13 (2d Cir.1984) (Van Graafeiland, J., concurring in part and dissenting in part), I agree with Judge Kaufman that District Judge Stewart's exercise of deliberate flexibility in permitting amendments of the consent decree was not an abuse of discretion. See Parker v. Broadcast Music, Inc., 289 F.2d 313, 314 (2d Cir.1961). Accordingly, I concur.
 
 MINER, Circuit Judge, dissenting:
 
 43
 There can be no doubt that a correctional facility must be safe, secure and well-ordered before an inmate confined therein may enjoy "rehabilitative benefits" such as those purportedly derived from the exercise of visitation privileges. We are instructed that all matters implicated in the administration of prisons, including safety, security and good order, "are peculiarly within the province and professional expertise of corrections officials, and ... courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974); see also Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); Bell v. Wolfish, 441 U.S. 520, 540 n. 23, 99 S.Ct. 1861, 1875 n. 23, 60 L.Ed.2d 447 (1979); Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform"). The need for modification of the sanctions provided by the consent decree in this case is a matter in which the professional judgment of the New York State Commissioner of Corrections is entitled to substantial deference. As to the increases in penalties proposed for visit-related misconduct, however, the Commissioner was not even afforded an opportunity in the district court to make an evidentiary showing in support of his assessment of the need to modify. I would remand with a direction to provide that opportunity. As to penalties for non-visit-related prison misconduct, the consent decree has no application whatsoever, and I would allow the sanctions proposed by the Commissioner for this type of misconduct to be implemented immediately.
 
 
 44
 The purpose of the final consent judgment was stated clearly in the judgment itself: "[T]he parties desire to enter into a stipulation settling without the necessity of further litigation the unresolved issue of what due process protections are appropriate for class members when accused of misbehavior relating to visiting rights " (emphasis added).[1] The judgment established due process procedures keyed to the severity of the punishment prescribed for visit-related misconduct. It included a chart of discrete sanctions, ranging from a warning to revocation of the visitation privilege, for specific types of misconduct involving abuse of the privilege. As the penalties increased, the due process protections available to inmates and visitors increased as well. Nowhere in the consent judgment, however, was there any indication that the Commissioner was to be without authority to suspend or revoke visitation privileges as a sanction for misconduct not arising in the visitation context.
 
 
 45
 Nor do the Regulations promulgated by the Commissioner in consequence of the consent judgment purport to prescribe penalties for general prison misconduct. In their present incarnation, the Regulations refer to the suspension or revocation of an inmate's right to receive visitors "based on visit-related misconduct," N.Y.Comp.Codes R. & Regs. tit. 7, Sec. 200.5(a)(5) (1986), and to the suspension or revocation of a visitor's right to visit an inmate "for a violation ... set forth in subdivision (f)" or "for misconduct ... as specified in subdivision (f)," id. Sec. 200.5(b) and (c). Subdivision (f), id. Sec. 200.5(f), is, in fact, a restatement of the chart of sanctions prescribed by the consent decree for offensive behavior occurring during visitation and, as such, is the object of the Commissioner's present application for modification. As has been demonstrated, however, neither the consent decree nor its codification forecloses the imposition of the sanctions of visit deprivation and suspension for offensive behavior occurring outside the visitation context. Accordingly, to the extent that the Commissioner's application seeks to suspend contact and non-contact visits to penalize drug offenses and other prison misconduct not occurring during the course of visitation, there is no need for modification of the consent decree. The Commissioner is fully authorized to proceed without court order or permission in this area of his expertise, provided that appropriate due process procedures attend the imposition of sanctions.[2]
 
 
 46
 In light of current conditions, especially the growing incidence of drugs within the New York prison system, it now appears to the Commissioner that many of the sanctions provided in the consent judgment for visit-related misconduct are inadequate, ambiguous or deficient. In retrospect, his consent to the judgment seems ill-advised. He now seeks to avoid the consequences of that consent by arguing that the sanctions portion of the judgment does not vindicate any federal constitutional right and that its enforcement therefore is barred by the eleventh amendment. This argument, whatever validity it might have, see Note, Federalism and Federal Consent Decrees Against State Government Entities, 88 Colum.L.Rev. 1796, 1800-01 (1988), ignores the power of the district court to enter and enforce a consent decree that "provides broader relief than the court could have awarded after a trial." Local Number 93, Int'l Ass'n of Firefighters v. Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986). More compelling is the Commissioner's contention that changed conditions dictate modification of the judgment.
 
 
 47
 A consent judgment settling institutional reform litigation of the type underlying the judgment here "must always be open to revision, even without the strong showing traditionally required for modification of a decree, namely, that the first choice is causing grievous hardship. A revision is justified if the remedy is not working effectively or is unnecessarily burdensome." Fiss, The Supreme Court--1978 Term--Foreward: The Forms of Justice, 93 Harv.L.Rev. 1, 49 (1979), quoted with approval in New York State Ass'n for Retarded Children, Inc. v. Carey, 706 F.2d 956, 970 (2d Cir.), cert. denied, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). "These settlements, more than those binding private parties, should be amenable to modification as circumstances change, as more promising policy techniques develop, or as conceptions of the public interest evolve." Note, The Modification of Consent Decrees in Institutional Reform Litigation, 99 Harv.L.Rev. 1020, 1036 (1986). Experience with the administration of a consent decree, therefore, is an important aspect of the standard for modification. See Donovan v. Robbins, 752 F.2d 1170, 1182 (7th Cir.1985). In describing his experience with the administration of the consent decree, the Commissioner has made a prima facie showing that certain sanctions provisions are ineffective, unduly burdensome and no longer in the public interest under current prison conditions. He should have an opportunity to expand upon that showing at an evidentiary hearing.[3]
 
 
 48
 As an example of the inadequacy of the visit-deprivation penalties provided by the consent decree, the Commissioner refers in his moving papers to the case of an inmate named Willie Bosket, who was confined at the Shawangunk Correctional Facility. During a visit with a friend in a visiting room at the Facility, Bosket stabbed and severely wounded a corrections officer in an incident that caused a state of panic among the visitors, guards and inmates in the visiting room. The Commissioner points out that the maximum penalty that could be imposed upon Bosket under the consent judgment was one year's loss of the privilege to visit with the person he was seeing at the time of the attack. It hardly seems unreasonable for the Commissioner, in the discharge of his duties to protect employees, visitors and prisoners, to seek an increase in sanctions that would allow him to bar a malefactor like Bosket from having any visitors during a period of visitation suspension.
 
 
 49
 It seems almost superfluous for the Commissioner to have reported a matter of common knowledge--the huge increase in the proportion of prisoners incarcerated for drug-related offenses. Moreover, more than 75% of all inmates have admitted to some prior drug use. The Commissioner notes: "The increase of inmates with drug histories has resulted in increasing difficulty keeping drugs out of prison. In 1987, an estimated 2,000 drug-related misbehavior reports were issued. Narcotics have increasingly become the new currency in certain facilities, and are the subject of extortion, gambling and other prohibited activities." Although drugs are introduced into prison facilities through corrupt officers, prison package rooms and visits, there is reason to believe that drugs passed during visits account for a large proportion of the increased drug trafficking in prisons.[4] An Incident Report attached to the moving papers recites the case of an inmate named Neri who ingested 38 drug-filled balloons acquired from his wife during a contact visit. The same inmate told prison authorities that on one occasion he had swallowed 360 balloons received in the visiting room and that it was very easy to secrete contraband in the human body, including the rectum. Neri admitted that he and his wife had smuggled drugs and money into various correctional facilities during the course of visitation on more than 100 occasions. Clearly, enough of a showing has been made to justify an evidentiary hearing where the Commissioner could attempt to demonstrate a change in circumstances requiring increased sanctions for drug-related visitation misconduct.[5]
 
 
 50
 I would remand for the presentation of evidence bearing on all the visitation penalty modifications sought. The majority would permit the Commissioner to "seek[ ] additional modifications in the future, should the situation change." I think that the future is now and respectfully dissent.
 
 
 
 [1]
 For example, the intentional introduction by a visitor of 25 grams or less of marijuana is punishable by up to three months suspension of contact visits between the inmate and that visitor on the first offense; up to three months suspension of all visits between the inmate and that visitor on the second offense; and a one year suspension of all visitation rights between the inmate and that visitor on the third offense. Complete revocation of all visitation rights may occur after the third instance of an intentional attempt to introduce the following types of contraband: alcohol, and money, more than 25 grams of marijuana. N.Y.Comp.Code R. & Regs. tit. 7, Sec. 200.5 (1988)
 
 
 [2]
 The sources of this postulate are: 1) Atascadero State Hospital v. Scanlon, 473 U.S. 234, 239-40, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985) (absent "express language" or "overwhelming implication" in the relevant text, no waiver may be deemed), 2) Pennhurst State School v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (prohibiting federal injunctive relief against state officials on the basis of state law), and 3) Swann v. Charlotte Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) (remedy must be narrowly tailored to scope of constitutional violation)
 
 
 [3]
 We note also that the Fifth Circuit has limited Kavanagh to decrees based solely on state law. Lelsz v. Kavanagh, 824 F.2d 372, 373 (5th Cir.1987); Ibarra v. Texas Employment Commission, 823 F.2d 873, 876-77 (5th Cir.1987)
 
 
 [4]
 The Commissioner does not appeal Judge Stewart's rejection of his claim that the sanctions were incidental to the purpose of the litigation
 
 
 [5]
 For a detailed analysis and critique, see Mengler, "Consent Decree Paradigms: Models Without Meaning," 29 B.C.L.Rev. 291 (1988)
 
 
 [6]
 Judge Miner's dissenting opinion asserts that because the terms of the decree do not govern non-visit-related misconduct, the Commissioner may implement his proposed visitation sanctions in this area without court approval. This theory misreads the decree itself and ignores both the purpose of the underlying litigation and the well-documented course of negotiations between the parties
 In his brief to this court, the Commissioner forthrightly concedes that "it had been ... long-standing policy that inmates would generally not be punished by loss of visitation privileges unless the visitor was also guilty of misconduct" and that "[t]his policy was reflected in the consent decree." Consistent with this goal, the parties determined that visitation sanctions would be used only in limited circumstances. The statement upon which the dissent relies does not indicate that the decree excludes non-visit-related misconduct. When the decree refers to "misbehavior relating to visitation rights," it is clear that the decree was intended to govern any and all situations where misbehavior could affect visitation privileges. The consequent lack of reference to non-visit-related incidents reveals that these were intentionally excluded from the decree. Indeed, the plain language of the decree supports this interpretation. For example, it states, "Grounds for the suspension of contact visiting rights shall be limited to the following...." This is a clear signal that these rights cannot be revoked in circumstances not enumerated.
 We note also that documentation of the negotiations and statements by the district judge confirm that the limited application of visitation sanctions resulted from the agreement of the parties--not from the narrow scope of the negotiations. Finally, our brother's comments ignore--and in fact contradict--the parties' own understanding of the decree and its underlying philosophy. Indeed, the sua sponte character of this interpretation--the Commissioner never advanced it at any stage of the litigation--underscores its weakness and reveals that frustration, rather than an objective determination of the issues before us, led to the conclusion.
 
 
 [7]
 See Handler & Ruby, "Justice Cardozo, One-Ninth of the Supreme Court," 10 Cardozo L.Rev. 235, 245 (1988) ("For many years Cardozo's opinion was regarded as the fountainhead of all learning on the modification of consent decrees, with most subsequent opinions starting and ending with his formulation.") This essay also includes a fascinating discussion of the opinion's evolution. Id. at 244-51
 
 
 [8]
 The dissenting opinion causes us concern because this is not a case governed by the "reasonable relation" standard. Nor is this an instance where we must "ordinarily defer to the[ ] expert judgment [of prison officials]." While these standards apply when evaluating the constitutionality of prison regulations, they play no role in determining whether changed conditions warrant modification of a consent decree. Upon entry of the decree, the district court accepted the obligation to monitor the area it covered. Moreover, the parties must also have contemplated continuing judicial supervision and control of the decree. While we respect the Commissioner's views, we simply cannot abdicate our supervisory role--a choice Judge Miner suggests. Indeed, our brother's position seems to distort the rationale for employing a more flexible standard when reviewing requests to modify in institutional reform litigation. The need to respond to changed situations motivated this shift from the rigors promulgated by Cardozo in Swift. But if we simply deferred to the state's position when it was reasonably related to a legitimate interest, or abstained because we lacked competence to evaluate the offered proof, we would tip too far in the opposite direction and severely chill the use of consent decrees by rendering them mutable at any time. The standard we set forth better accommodates the need for balance
 
 
 [9]
 In Association for Retarded Children, the proposed modification furthered the primary purpose of the decree. 706 F.2d at 969
 
 
 [10]
 The dissent relies on a single emotional and sensational incident as proof sufficient to meet a suggested amorphous prima facie showing of "the inadequacy of the visit deprivation penalties provided by the consent degree." Willie Bosket admittedly stabbed a prison guard during a visit. But our brother Miner fails to mention that the Bosket case was so unusual that the Commissioner eventually housed the inmate in a specially-constructed cell. Moreover, the Commissioner offered nothing to show that similar incidents occur with any degree of frequency. Nothing was presented to inform us of the number of additional incidents; or that the Commissioner had sought to use other disciplinary methods--even unsuccessfully--to curb the problem
 
 
 [11]
 Of course, nothing we have said precludes the Commissioner from seeking additional modifications in the future, should the situation change
 
 
 [1]
 My brethren read "misbehavior relating to visiting rights" as covering "any and all situations where misbehavior could affect visitation privileges." Then, because no penalties are provided for non-visit-related offenses, the majority concludes that the parties intended that no visit-deprivation penalties ever would be provided for non-visit-related offenses. This interpretation ignores the negotiations leading to the stipulation of settlement, misconstrues the plain language of the consent decree, flies in the face of logic and contravenes the rules of construction. Judge Stewart, in the opinion under review, acknowledges that the consent decree speaks only to "visitor-related offenses." There is no indication anywhere that either the parties or the district judge ever intended the consent decree to foreclose the Commissioner from imposing visit deprivation as a punishment for non-visit-related misconduct, the expansive interpretations and bald conclusions of the majority to the contrary notwithstanding
 
 
 [2]
 The majority observes that "the Commissioner never advanced ... at any stage of the litigation" the contention that he was authorized to impose penalties of visit deprivation for non-visit-related misconduct without court permission. This observation is of little consequence, since an "objective determination" calls for our interpretation rather than the Commissioner's
 
 
 [3]
 My brethren seriously mischaracterize the standards I would employ for modification of the consent decree. I do not: suggest that we simply accept the state's position if reasonably related to a state interest; argue that we owe complete deference to prison officials; or contend that we abdicate our supervisory role. My standard is stated clearly in the text, and I merely would afford the Commissioner an opportunity to meet it. The majority opinion proclaims that the standard set forth therein "better accommodates the need for balance." My approach better accommodates the need for flexibility in the face of changed conditions
 
 
 [4]
 To characterize as "unfounded" my view that smuggling during prison visits accounts for a great deal of the increased drug trafficking in prisons, as the majority does, is to disregard the showing already made by the Commissioner, deny as judges what we know to be true as citizens, and evade a reality that will not disappear by virtue of non-recognition
 
 
 [5]
 Complaining that this dissenting opinion "leaves the erroneous impression that the Commissioner was never heard in this matter," the majority notes that "[t]he district court heard oral argument from all counsel prior to rendering its decision." The complaint is baseless. An oral argument is much different from an evidentiary hearing, and, although I nowhere deny that the Commissioner had the benefit of the former, I maintain that he has made a sufficient showing to be entitled to the latter