**UNITED STATES of America and State of New York, Plaintiffs,**

v.

**COUNTY OF NASSAU and Nassau County Department of Public Works, Defendants.**

**No. CV 89–2532.**

United States District Court,
E.D. New York.

Feb. 26, 1990.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., and Deborah B. Zwany, Asst. U.S. Atty., Brooklyn, N.Y., and Bruce C. Buckheit, Sr. Litigation Counsel, U.S. Dept. of Justice (Charles E. Hoffmann, Asst. Branch Chief, U.S. E.P.A., of counsel), and Robert Abrams, Atty. Gen., State of N.Y., and Ann L. Goldweber, Asst. Atty. Gen., New York City (Richard Williams, New York State Dept. of Environmental Conservation, of counsel), for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison (Gaines Gwathmey and John N. Gevertz, of counsel), New York City, for defendants.

Owen B. Walsh, of counsel, Mineola, N.Y., for County of Nassau.

MISHLER, District Judge.

Defendants, County of Nassau and Nassau County Department of Public Works ("Nassau"), move to modify the Consent Decree and Enforcement Agreement ("Decree") "so ordered" on August 2, 1989 by deleting from Article V, Dewatering Measures For Land Based Management Of Sewage Sludge—the schedule requiring Nassau to construct and operate dewatering equipment capable of processing 100 percent of Nassau's sludge by December 31, 1991. The application does not affect Nassau's obligation to have dewatering equipment capable of processing 50 percent of its sludge by June 30, 1991. Article V, para. 7.[1]

Nassau's request for modification of the Decree is based on its decision to use a private vendor to fulfill its obligations which, in turn, was a result of requests for proposals issued on March 1, 1989 and July 10, 1989. Article IV, "Solicitation of Proposals For Land–Based Management of Sewage Sludge." Paragraphs 4 and 5 of Article IV state in pertinent part:

4. Any party may propose modification of the schedules for implementation of land-based management of sewage sludge as a result of the process set forth in paragraph IV.B.1, 2 and 3 by January 15, 1990. . . .

5. If the parties agree to seek a modification of paragraph V, VI or VII hereof, they shall seek one as appropriate in accordance with paragraph XII no later than February 28, 1990. If there is no agreement, any party may petition the court for a modification or may seek relief from the milestone events set forth in paragraphs VI and VII in accordance with paragraphs XII and XIV, as appropriate.[2]

Nassau's motion seeks relief from the time schedule imposed and to substitute a schedule in keeping with Nassau's decision to contract with a private vendor. Nassau argues that "[u]nder this alternative system, optimally the sludge would not be disposed of in a landfill, but would be put into a form where the sludge could be reused. The full operation of this system is to commence by December 31, 1994." (Nassau brief, p. 4)

History and Background Leading to the Decree

Congress enacted the Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA"), 33 U.S.C. § 1401 et seq., declaring that it is the policy of the United States "to regulate the dumping of all types of materials into ocean waters and to prevent or strictly limit the dumping into ocean waters of any material which would

---

1. On Friday, February 16, by letter motion, the government moved to disqualify one of Nassau's attorney's. As the court explained to the parties at the oral argument held on Tuesday, February 20, it would give the modification motion priority because of the time schedule involved. The court does not address the disqualification motion since it would only delay the present motion.

2. Article XII reads in pertinent part:
Nothing herein shall be construed to limit any party's rights pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

adversely affect human health, welfare or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U.S.C. § 1401. In 1974 and 1975, the United States Environmental Protection Agency ("EPA") required ocean dumpers to apply for permits. In 1976, only nine major municipalities including Nassau continued ocean dumping on EPA permits which provided a schedule with a view to end ocean dumping by December 31, 1981. Congress reinforced the goal to end ocean dumping by amending the MPRSA in 1977 by requiring an end to ocean dumping of sewage sludge by December 31, 1981, P.L. 95–153 and by requiring an end to ocean dumping of industrial waste by December 31, 1981, P.L. 96–572.

Between 1977 and 1981 the EPA and New York State gave financial assistance to Nassau and other municipalities for the purpose of developing alternatives to ocean dumping. Nassau constructed a dewatering facility at Cedar Creek in 1981. It did not become fully operational. The interpretation of the December 31, 1981 deadline for ending ocean dumping in the 1977 amendments to MPRSA in *City of New York v. United States Environmental Protection Agency*, 543 F.Supp. 1084, 1088 (S.D.N.Y.1981) placed the effectiveness of that date in doubt. Nassau entered into a consent decree with the EPA permitting the continued dumping of sewage sludge into the ocean.

The Ocean Dumping Ban Act of 1988 ("Act") amended the MPRSA, *inter alia*, by prohibiting the dumping of sewage sludge into the ocean after August 14, 1989 unless permitted by the EPA. The House amendment required all dumpers, within six months of enactment, to enter into one of two types of agreements—a compliance agreement for those who could end ocean dumping by the deadline and an enforcement agreement for those who could not

meet the deadline. 33 U.S.C. § 1401. The enforcement decree was to phase out such ocean dumping. The Act makes it unlawful to dump sewage sludge in the ocean after December 31, 1991.

The Decree outlines a plan in which Nassau will cease ocean disposal of 50 percent of its sewage sludge by June 30, 1991 and all dumping of sewage sludge by December 31, 1991 through implementation of interim measures. Article V sets a time schedule for dewatering the sludge.[3] Article VI sets the schedule for disposal or reuse of the dewatered sludge. The long-term plan contemplates the incorporation of the equipment and procedures developed in the interim plan.

Present Facilities

In 1981 Nassau constructed the Cedar Creek Wastewater Pollution Control Plant. Its operation was suspended as a result of the decision in *City of New York v. United States Environmental Protection Agency*, *supra*. Cedar Creek will be fully operational by June 30, 1991. Sewage treatment plants exist at Bay Park and Inwood, but they are not functioning as dewatering facilities.

The sewage sludge from Inwood, Belgrave and West Long Beach is hauled to Bay Park. The sewage sludge from Cedar Creek is piped to Bay Park. All the sewage sludge from these communities together with the sewage sludge from Bay Park is placed on barges and dumped in the ocean at a site off the continental shelf designated as "the 106 mile site."[4]

Modification of a Consent Decree

Fed.R.Civ.P. 60(b) provides that a court may relieve a party from a final judgment, order, or proceeding when, *inter alia*, it is "no longer equitable that the judgment should have prospective application" or "any other reason justifying relief from the

---

3. "Dewatering" is a process by which the water is removed from the sludge to produce a dry "cake." It is ordinarily accomplished by means of filter presses, belt filter presses, or centrifuges. The initial dewatering step usually raises the solids content of the sludge from 2 percent to 15–23 percent. (Kiselica Aff., ¶ 14).

4. Since 1920 until 1985 most sewage sludge was dumped at "the 12 mile dump sites in the New York Bight Apex." On April 1, 1985, EPA closed the 12 mile dump site "the 106 mile site" for dumping for a period of five years from March 1986. The 106 mile site is 115 nautical miles from Atlantic City, New Jersey.

operation of the judgment." Fed.R.Civ.P. 60(b)(5) & (6). A court deciding a Rule 60(b) motion "must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality." *Kozlowski v. Coughlin*, 871 F.2d 241, 246 (2d Cir.1989); *Kotlicky v. United States Fidelity & Guaranty Company*, 817 F.2d 6, 9 (2d Cir.1987) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2857 (1973)).

The oft-quoted *Swift* standard for modifying a consent decree provides that "[t]he inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). *See also United States v. American Society of Composers*, 586 F.Supp. 727, 728–29 (S.D.N.Y.1984); *Air Transport Association of America v. Professional Air Traffic Controllers Organization*, 516 F.Supp. 1108, 111 (E.D.N.Y. 1981), *aff'd*, 667 F.2d 316 (2d Cir.1981). As explained in *United States v. United Shoe Manufacturing Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), a decree may be changed by an appropriate showing, but may not be changed in the "interests of the defendants if the purposes of the litigation as incorporated in the decree ... have not been fully achieved." *Id.* at 248, 88 S.Ct. at 1499.

■ In determining whether modification is appropriate, the analysis must begin by identifying the "essential purpose or purposes of the decree in question, and weighing the impact of the proposed modification on that ultimate objective." *Kozlowski, supra*, at 247. The party seeking modification bears the burden of clearly showing that modification " 'is essential to attaining the goal of the decree.' " *Id.* at 247 (quoting *New York State Association for Retarded Children v. Carey*, 706 F.2d 956, 969 (2d Cir.1983) (Friendly, J.)). Once

done, the movant must then show that "each change prunes the decree deftly, changing only as much as is required and leaving the ability to obtain the ultimate goal intact." *Id.* at 248.

■ Determining the goal of the decree turns on its construction. Although enforced as judicial acts, consent decrees are construed as contracts. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975); *Canterbury Belts Ltd. v. Lane Walker Rudkin, Limited*, 869 F.2d 34, 38 (2d Cir.1989). Thus, the meaning and purpose of a consent decree should be discerned from the "four corners" of the decree. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *Canterbury Belts, supra*, at 38. The explicit language of the decree is given its plain meaning and is afforded great weight. *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985). *See also United States v. Atlantic Refining Co.*, 360 U.S. 19, 22–23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959); *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 892–93 (9th Cir.1982); *Artvale, Inc. v. Rugby Fabrics Corp.*, 303 F.2d 283, 284 (2d Cir.1962). If terms in the decree are ambiguous, the court may consider evidence surrounding its negotiation. *ITT Continental Baking Co., supra*, at 238 n. 11, 95 S.Ct. at 935 n. 11; *Canterbury, supra*, at 38.

■ Additional considerations inform the construction of a consent decree adopted to enforce a statute. Just as a court must consider whether the decree adequately protects the public interest in approving the consent decree, it must also consider the public interest in modifying that decree. *United States v. Wheeling Pittsburgh Steel Corporation*, 866 F.2d 57, 59–60 (3rd Cir.1988) (modification of decree entered under the Clean Air Act, as amended, 42 U.S.C. § 7502(a)(1) (1983); *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C.Cir.1983) (approval of settlement agreement pursuant to Federal Water Pollution Control Act Amendments of 1972, §§ 101 *et seq.*);

*State of New York v. Town of Oyster Bay*, 696 F.Supp. 841, 843 (E.D.N.Y.1988) (approval of consent decree pursuant to the Comprehensive Environmental Response, Compensation & Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*); *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1337 (S.D.Ind.1982) (approval of consent decree pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and CERCLA). Thus, in construing the decree, the congressional policy decision embodied in the statute it was adopted to enforce is given great weight. *Wheeling–Pittsburgh*, *supra*, at 60. *See System Federation No. 91 v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961) ("[J]ust as the adopting court is free to reject agreed upon terms as not in furtherance of statutory objectives, so must it be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives."). In addition, the language of the statute and the legislative history accompanying may limit the court's equitable discretion to modify the decree in contravention of the statute.

■ In support of its request to modify the schedule for construction and operation of the dewatering plant, Nassau argues that its primary intention is "to find an alternative solution to constructing dewatering facilities at either its Bay Park or Inwood Sewage Treatment Plant sites because proper time has not been allowed to evaluate long-term facilities at any of the County facilities or long-term proposals from private vendors." (Fangmann Aff., ¶ 3). Nassau also states that its intent in seeking modification is "to produce a reusable product at the earliest possible date to avoid the limited short term aspect of landfilling of dewatered sludge." (Fangmann Aff., ¶ 4). However, the county recognizes that "even the private vendors must utilize dewatering and landfilling on an interim basis," but argues that the private vendors are better able than the county to contract with available landfills and pursue other options. (Fangmann Aff., ¶ 30).

In addition, Nassau argues that the schedule set forth in Article V of the decree is too "tight" and does not allow enough time for "a thorough planning effort or public involvement program to consider the construction of a dewatering facility." (Fangmann Aff., ¶ 6). Finally, the county argues that there are substantial adverse environmental impacts from constructing dewatering facilities at either Inwood or Bay Park. (Fangmann Aff., ¶¶ 38–41). In particular, the increased truck traffic through the "narrow residential streets" of Bay Park "leaves the Bay Park site as unacceptable." (Fangmann Aff., ¶ 39). Construction of the dewatering plant at Inwood is unacceptable because of the "limitation on available property" at the site, due in part to the sewage plant's proximity to tidal wetlands. (Fangmann Aff., ¶ 40).

The county also argues that the decree contemplates "a two-stage plan that the County must follow to cease the ocean dumping of sewage sludge." (Def. Brief, p. 3). The first stage of the plan is the interim requirements: 50 percent of the county's sludge must be disposed of in a land-based management by June 30, 1991, and 100 percent of the county's sludge must be disposed of by December 31, 1991.[5] According to the county, this first stage *also* has two tracks. (Nassau brief, p. 4). The first track requires Nassau to submit requests for proposals (RFPs) from the private sector for land-based management. The purpose of these requests is to locate a private vendor that can meet the county's obligations. As Nassau notes, the decree itself specifies that the parties are to meet and discuss the proposals. Article IV, para. A. In addition, if the proposals are "sufficiently promising," then either party may request modification of the schedule for implementing the land-based sludge management. Article IV, para. B, sec. 4.

---

5. The second stage of this plan requires the county to implement a long-range alternative to land-based sludge management. This plan, which must be implemented by December 31, 1994, requires the county to develop beneficial reuse of the sludge.

The second track of this first stage requires the county to build and implement the land-based sludge management. Articles V and VI. The purpose of these two tracks, according to Nassau, is to provide it with flexibility. They contend that the modification clause in the decree must have been intended to allow the county the option of pursuing either the private vendor or county track, depending on which was found to be superior.

This two track construction of the decree is incorrect. By the plain meaning of its terms, Nassau "shall implement dewatering measures for land-based management of sewage sludge in compliance with the following milestone events: ... [c]ommence on-site construction of all sludge dewatering facilities by June 30, 1990." Article V, para. 6. Nassau was to solicit proposals for "land-based sludge management options," Article IV, and to select a "land-based alternative," Article IV, para. B, sec. 2, that is, proposals for the disposal of the dewatered sludge.

The November 1989 Nassau County's *Draft Generic Environmental Impact Statement Interim Report No. 3*, which supplements the December 1988 *Evaluation of Long–Term Sludge Disposal Alternatives*, shows that Nassau County clearly understood its obligations under the decree to implement dewatering measures. Nassau County environmentally analyzed four alternatives to incineration and beneficial-use alternatives. Each of the fourteen proposals required dewatering at Inwood or Bay Park and Cedar. More importantly, each of the proposals identified dewatering as the precedent to land-based management of the sludge. (Kiselica Aff., ¶ 20 & 21).

If dewatering was considered part of "land-based management," one would expect the RFPs deadlines to be tied to the dewatering schedule. But they are not. For example, the deadline for the "[c]omplete final design of all sludge dewatering facilities" is March 31, 1990. Article V, para. 2. However, all information gathered by Nassau as a result of the RFPs was not to be presented to the United States and the State until *December 31, 1989.*

Rather than follow the decree's mandate regarding land-based management, Nassau's Final Request for Proposals issued on July 10, 1989 did not provide for dewatered sludge from Bay Park and Inwood. (DeZolt Aff, ¶ 63 & 64). In addition, Nassau incorrectly limited the proposals to only address wet sludge from the Bay Park/Inwood plants and by using the process only to identify long-term options rather than to satisfy the interim goals of land-based management. (DeZolt Aff., ¶ 67.). Nassau is free to select a private vendor to build and construct its dewatering equipment. Several of the responses to the RFPs in fact offered an option for sludge management in Inwood or Bay Park. (Kiselica Aff., ¶ 36). However, all finalist vendors considered by Nassau involve remote-site processing of wet sludge. Rather than follow the purpose of the decree, Nassau appears to be pursuing its own agenda.

The essential purpose of the decree is clear: to end all ocean dumping by December 31, 1991. The Conference Report states: "It's clear that we cannot count on the EPA which has earned the name the Environmental Procrastination Agency. We need a firm deadline, in the law, to end the ocean dumping of sewage sludge and industrial waste. Only then, will alternatives be put in place. Only then, will the dumping stop." Senate Debate and Conference, Vol. 134 Cong.Rec. S16685 (daily ed. Oct. 18, 1988) (Statement of Senator Lautenberg) The Conference Report also states:

> In the event that the dumper cannot meet the deadline through the use of a long-term alternative, the dumper must try to utilize interim measures to meet the deadline. EPA and the State must assist the dumper in identifying such interim measures to meet the deadline. EPA and the State must assist the dumper in identifying such interim measures and EPA must not sign an enforcement agreement to allow dumping to continue past the 1991 date where reasonable in-

terim measures exist to end the dumping prior to the deadline. EPA's focus in entering into agreements with the existing dumpers must be to end the ocean dumping of sewage sludge and industrial waste at the earliest possible time.

Senate Debate and Conference, Vol. 134 Cong.Rec. S16685–16686 (daily ed. Oct. 18, 1988) (Statement of Senator Lautenberg).

The legislative history of the Ocean Dumping Ban Act shows not only that Congress wanted to close every legal loophole that the municipalities could find to delay that deadline, but expresses its anger and frustration that the nine municipalities had evaded the 1981 deadline for the cessation of ocean dumping. The Conference Report states:

> This legislation should never have been added. Over a decade ago, Congress thought it had banned ocean dumping. Unfortunately, New York City and other dumpers took the Environmental Protection Agency to court as the deadline approached and won. The case not only eliminated the 1981 deadline, it also effectively ended any chance that ocean dumping would come to a halt at any time without a new law.

Senate Debate and Conference, Vol. 134 Cong.Rec. S16689 (daily ed. Oct. 18, 1988) (Statement of Senator Biden).

The purpose of the decree, which was entered into pursuant to the Ocean Dumping Ban Act, was to end ocean dumping without delay. As apparent from the above quotes, Congress clearly intended to severely limit the equitable discretion of a court to extend the compliance dates of a dumper.

Not only has Nassau incorrectly interpreted the purpose of the decree, they have failed to demonstrate that the proposed modification would further the purpose of the decree. First, the dates suggested by the proposals, which state that the facilities will be in operation by December 31, 1991, cannot be relied upon. There is no guarantee that a contract will be negotiated and there is no guarantee that a remote site will receive the appropriate permits and have its environmental review process completed in time to meet the milestone in Section VI, para. 1, which requires that the county execute the contracts for interim land-based disposal of 50 percent of its sludge by March 31, 1991. (Kiselica Aff., ¶ 62 & 63).

.For example, the state law requirements for siting a dewatering away from the location of the wastewater treatment plant where the sludge is generated involve both a public hearing and administrative review of contested issues. (DeZolt Aff., ¶¶ 27–29). Approval of the remote site will also involve a preliminary environmental review, application completeness, public notice requirements and opportunity for public comment, and record preparation. (DeZolt Aff., ¶ 29). Receiving approval alone for a remote site may entail a delay of over a year. (DeZolt Aff., ¶ 29). Nassau has essentially completed the environmental review process necessary to site a dewatering facility at Bay Park or Inwood.[6] (DeZolt Aff., ¶ 34).

Second, any remote site chosen by the county will likely encounter substantial public opposition that will engender further delay. The only two remote sites mentioned in the proposals are Staten Island and Pennsylvania. The Ocean Dumping Ban Act contains a prohibition on the disposal of any sewage sludge in Staten Island, including sludge generated by Staten Island.[7] The governor of Pennsylvania recently imposed a moratorium on additional out-of-state dumping of sludge in Pennsylvania. (Fangmann Aff., Ex. G). The proposed modification by Nassau will only frustrate the purpose of the Decree by delaying the end of ocean dumping.

---

**6.** The environmental review of these sites was presented to the state and federal governments in September, 1989. Nassau could have selected its site as early as October 1989. It would then proceed with a site specific environmental review required by state law, N.Y. Environmen-

tal Conservation Law, Art. 8 (McKinney 1984 & Supp.1990). (Aff. of DeZolt, ¶ 76).

**7.** This prohibition was included in the Ocean Dumping Ban Act by Guy Molinari, then a congressman and now Staten Island borough president.

The Ocean Dumping Ban Act was intended to promote the interest of the general public in clean and safe ocean waters. The existence of diseased fish too toxic to eat, the existence of garbage and medical waste on the shores and beaches, the closure of one-third of all shellfish beds in the United States, and the death of marine animals has been traced to ocean dumping. Senate Debate and Conference, Vol. 134 Cong.Rec. S16685 (daily ed. Oct. 18, 1988) (Statement of Senator Lautenberg). The Act expresses a national policy to safeguard the oceans and end ocean dumping.[8] Thus, a consideration of the public interest also dictates that modification of the Decree be denied.

Not only has Nassau failed to demonstrate that the modification will advance the purpose of the decree, it has failed to demonstrate any new and unforeseen conditions that would require modification of the decree, much less "a clear showing of grievous wrong evoked by new and unforeseen conditions." *Swift, supra,* 286 U.S. at 119, 52 S.Ct. at 464. First, Nassau anticipated substantial public opposition to siting the facility at Bay Park or Inwood before it signed the Decree. (Kiselica Aff., ¶ 4). Nassau was also aware that the space limitations at Inwood and the residential character of Bay Park would be an area of concern in siting the dewatering facility. (Kiselica Aff., ¶ 25). In addition, contrary to Nassau's assertions, these problems are not substantial and could be mitigated. (Kiselica Aff., ¶¶ 40–49).

Nassau's motion for modification of the Decree is denied.

---

**8.** The court also notes that the residents of Nassau County will be poorly served by a modification that requires the county to invest in a remote site dewatering plant. Aside from land and construction costs, remote site dewatering will involve the costs associated with barging 919,000 tons of sewage sludge to the site and almost 90 percent of it back to Nassau County for further processing. (Kiselica Aff., ¶ 51). In addition, if constructed by the county, Nassau is eligible for low-interest loans from the New York State Department of Environmental Conservation. (DeZolt Aff., ¶ 31).