**Pedro ESCALERA and Rose Escalera, on behalf of themselves and all other persons similarly situated, Plaintiffs,**

v.

**NEW YORK HOUSING AUTHORITY, et al., Defendants.**

No. 67 Civ. 4307 (LAP).

United States District Court, S.D. New York.

April 19, 1996.

Scott Rosenberg, Judith Goldiner, Joshua Goldfein, Adriene Holder, The Legal Aid Society, Civil Division—Civil Appeals and Law Reform Unit, New York City, for plaintiffs.

Henry Schoenfeld, Nancy Harnett, Mark Walter, New York City Housing Authority, New York City, for defendant New York City Housing Authority.

Frank S. Moseley, Jonathan K.M. Crawford, Lisa G. Rosen, Davis, Polk & Wardwell,

New York City, for Interim Council of Presidents, et al.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESKA, District Judge:

Plaintiffs Pedro and Rose Escalera (the "Escaleras"), tenants in New York City public housing, filed a class action in 1967 under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983 against defendant New York City Housing Authority (the "Housing Authority") and certain of its officers. The Escaleras alleged violations of their rights secured by the Fourteenth Amendment Due Process Clause and the United States Housing Act of 1937, as amended, 42 U.S.C. §§ 1401 *et seq.* Prior to a trial on the merits, the parties entered into a stipulation of settlement which subsequently was incorporated into a decree (the *"Escalera* Decree").

The Housing Authority has moved for an order clarifying or, under Rule 60(b)(5) of the Federal Rules of Civil Procedure, modifying the *Escalera* Decree to allow it to proceed under New York Real Property Actions and Proceedings Law ("RPAPL") Sections 711(5) and 715 (collectively, the "Bawdy House Law") in the context of apartments used to traffick narcotics. Following oral argument, a hearing (the "Hearing") was held over three days, at the conclusion of which I reserved decision.[1] Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the following shall constitute findings of fact and conclusions of law in support of my decision in favor of the Housing Authority.[2]

### FINDINGS OF FACT

Upon assessing the evidence in the record[3] and taking into account my observations of the demeanor and assessments of the credibility of those witnesses who testified at the Hearing, I find the following to be facts in this action.

### I. *Parties*

1. The Housing Authority owns and operates, with the financial assistance of the United States, the State of New York, and the City of New York, low-rent public housing within the City of New York. (Complaint ("Compl.") at 3); N.Y. Pub. Hous. Law § 401. It is the largest such authority in the country. (Affidavit of Sally Hernandez–Pinero ("H–P Aff.") ¶ 1.)

2. Intervenor-plaintiff Interim Council of Presidents ("ICOP") is an organization comprised of the District Chairpersons of each of the eight public housing districts in the City of New York. (Affidavit of Frank S. Moseley ("Moseley Aff.") ¶ 2.) ICOP serves in an advisory capacity to the Housing Authority regarding tenant issues. (*Id.* ¶ 3.)

3. Intervenor-plaintiffs Gerri Lamb, Cornelia Taylor, Dianne Jackson, Nicoletta Azure, Ronald Ward, and Keith Mitchell are Chairpersons of ICOP. (*Id.* ¶ 4.)

4. The Escaleras became tenants in Housing Authority public housing in 1957. (Compl. at 2.)

### II. *Witnesses and Principal Affiants*

5. Joseph Keeney ("Keeney") currently is an Assistant Chief of Patrol of the New York Police Department ("NYPD"). (Testimony of Keeney, Transcript ("Keeney, Tr.") at 5.) Prior to this position, which began in 1995, Keeney was the Chief of Patrol of the Housing Authority Police and was responsible for the delivery of police services to all of the public housing developments in New York City. (*Id.*) He began his employment with the Housing Authority in 1961. (*Id.*)

6. DeForrest Taylor ("Taylor") served with the Housing Authority Police from 1990 until 1994 as the Chief of Police. (Testimony of Taylor, Transcript ("Taylor, Tr.") at 94.)

---

**1.** By agreement of the parties, affidavits previously submitted in connection with the Housing Authority's motion served as direct testimony, and those affiants designated by the parties were cross-examined during the Hearing.

**2.** For a thorough overview of this litigation and an argument in favor of modifying the *Escalera* Decree due to the drug epidemic which has aris-

en since the early 1970's, see Valerie D. White, Note, *Modifying the Escalera Consent Decree: A Case Study on the Application of the Rufo Test,* 23 Fordham Urb.L.J. 377 (1996).

**3.** This evidence includes written submissions by class members pursuant to the Notice of Hearing posted by the Housing Authority on its premises.

Prior to 1990, he was Chief of Personnel for the NYPD and held other positions within the NYPD dating back to 1956. (*Id.*)

7. Mark Kleinman ("Kleinman") is an Associate Professor of Public Policy at the John F. Kennedy School of Government, Harvard University, and a specialist in the abuse of controlled substances. (Affidavit of Kleinman ("Kleinman Aff.") ¶ 1.) Kleinman has examined the marketing and consumption of illegal drugs in many urban areas in the United States, has personal knowledge of the conditions inside Housing Authority projects, and frequently advises federal and local governments on drug policy. (*Id.*; Testimony of Kleinman, Transcript ("Kleinman, Tr.") at 213.)

8. Steven Belenko ("Belenko") is a Senior Research Fellow at the New York City Criminal Justice Agency, which provides pretrial services to New York City courts, such as interviewing arrestees, making recommendations at arraignments, and supervising release projects. (Declaration of Belenko ("Belenko Aff.") ¶ 1.) Belenko is a research specialist in the areas of crack and criminal justice. (*Id.*)

9. Alan D. Aviles ("Aviles") is the General Counsel of the Housing Authority, and, therefore, is responsible for the legal affairs of the Housing Authority and for the management and supervision of its Law Department. (Affirmation of Aviles ("Aviles Aff.") ¶ 1.)

10. As of August 1993, Sally Hernandez–Pinero was the Chairwoman of the Housing Authority. (H–P Aff. ¶ 1.)

III. *Genesis of the Escalera Decree*

11. In 1957, when the Escaleras first became Housing Authority tenants, the Housing Authority required its tenants to sign month-to-month automatically renewable leases which either party could terminate by giving one month's notice to the other party. *Escalera v. New York City Housing Auth.*, 425 F.2d 853, 857 (2d Cir.), *cert. denied*, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970).

12. The Housing Authority also required its tenants to sign the Tenant Rules and Regulations upon the execution of their leas-

es. *Id.* at 859. If the Housing Authority determined that a tenant violated these rules and regulations, *id.*, or that a tenant was non-desirable, *id.* at 857, it could terminate the tenancy.

13. The Housing Authority terminated the Escaleras' tenancy for violating the rules and regulations. *Id.* at 860.

14. For several years, the Escaleras owned a dog. *Id.* at 859. In July 1967, the project manager warned them that keeping the dog violated Housing Authority rules. Although Mr. Escalera told the project manager that they sold the dog, the project manager demanded written proof. *Id.* at 860. On September 29, 1967, the Escaleras received a notice to vacate signed by the project manager informing them that their tenancy was terminated and that they should vacate their apartment by October 31, 1967. *Id.*

15. The Housing Authority terminated the tenancies of the Rolles and the Humphreys, other class members, on the ground of non-desirability. *Id.* at 859.

16. Due to alleged anti-social acts of the Rolles' son, such as statutory rape, and the arrest of Mr. Humphrey on a narcotics charge several miles from the housing project, the Housing Authority instituted termination proceedings against these families. *Id.*

17. Both families requested hearings as provided by the Housing Authority procedures. *Id.*

18. The Rolles, however, refused to go forward with their hearing after the Tenant Review Board Panel (the "Panel"), which consists of Housing Authority officers, denied their requests for procedural safeguards such as advance notice of the complete charge, a transcript of the hearing, confrontation and cross-examination of witnesses, and an impartial hearing examiner. *Id.* The Panel granted only the Rolles' request to examine their tenant folder, which contained the entire history of their tenancy and upon which the panel based its decision. *Id.*

19. The Humphreys participated in their hearing and, although they were not allowed

to inspect their tenant folder, the Panel found them to be non-desirable and gave them notice of termination. *Id.*

20. On November 2, 1967, the Escaleras, on behalf of themselves and all others similarly situated, filed suit against the Housing Authority and certain of its officers, alleging that the Housing Authority's policies and practices for terminating tenancies violated their rights secured by the Fourteenth Amendment Due Process Clause and by the United States Housing Act, as amended, 42 U.S.C. §§ 1401 *et seq.* (Compl. at 1.)

21. With respect to termination based on a violation of the rules and regulations, the Escaleras demanded a prior opportunity to contest the reasons for termination. *Escalera,* 425 F.2d at 860.

22. With respect to termination based on non-desirability, the Escaleras demanded written notice prior to a hearing of all grounds to be relied on in the decision, notice of the rules governing the Tenant Review Board panel at the hearing, inspection of the tenant folder, exclusion of items about which advance notice was not given, confrontation and cross-examination of witnesses, exclusion of hearsay items, the right to compel attendance of witnesses, the keeping of a written record of the hearing, an impartial hearing examiner, a written decision with findings of facts and reasons, and access to prior decisions as precedent. *Id.* at 859.

23. The Housing Authority moved under Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the complaint. *Id.* at 856.

24. Although Judge Sylvester J. Ryan of this Court granted the motion, the Court of Appeals reversed and remanded the action for a trial on the merits. *Id.* at 857. The Court of Appeals held that "granting every favorable inference to plaintiffs' complaints and affidavits, it appears that the [Housing Authority's] procedures are deficient in several specific aspects." *Id.* at 867.

25. The procedures for terminating tenancies on the ground of non-desirability potentially violated the Due Process Clause by: (1) failing "to give the tenant advance notice of all the items which might be considered against him so that he may challenge these items," (2) "denying tenants access to the material in their folders, when the entire folder is considered by the [Panel] in its determination of eligibility," (3) "denying the tenant the opportunity to confront and cross-examine persons who supplied information in the tenant's folder upon which the [Housing Authority's] action is grounded," and (4) failing "to disclose the rules and regulations in the [Panel's] Handbook governing the ... [P]anel at the hearing concerning termination for non-desirability." *Id.* at 862–63.

26. The procedures for terminating tenancies on the ground of violation of rules and regulations, according to the Court of Appeals, suffered "the first three deficiencies of the [Panel's] procedures" for terminating tenancies on the ground of non-desirability. *Id.* at 863. "The tenant should be notified in advance of the complete grounds for the proposed action; should have access to all the information upon which any decision will be based, and should be afforded the right to confront and cross-examine witnesses in appropriate circumstances." *Id.* "In addition, it would seem that the tenant should be afforded the opportunity to present his side of the case in the presence of an impartial official, not merely the project manager who instituted the proposed action against the tenant." *Id.*

## IV. Procedures of the Escalera Decree

27. On March 24, 1971, prior to a trial on the merits of these constitutional claims, the Housing Authority and the Escaleras entered into the *Escalera* Decree. Judge Walter R. Mansfield of this Court ordered, adjudged, and decreed that the action was "settled according to the terms of the stipulation and exhibits annexed hereto and incorporated herein by reference, which ... embody new procedures for termination of tenancies, which the Court hereby approves as in conformity with the requirements of due process of law as set forth in *Escalera v. NYCHA,* 425 F.2d 853 (2d Cir.1970)." (Aviles Aff., Ex. A.)

28. The procedures and notice of hearing made part of the *Escalera* Decree

apply to termination of tenancy for Nondesirability, Breach of Rules, Non-cooperation, Chronic Rent Delinquency, Nonverifiable Income, Transfer of Possession, Residual Single Person Occupancy, Misrepresentation, and to any further categories of misconduct other than nonpayment of rent which the New York City Housing Authority may establish in the future as a ground for termination of tenancy. *(Id.)*

29. The parties intended that they "[p]rovide more specific notice of the reasons for the proposed termination action," "[d]isclose to the Tenant at a hearing the evidence upon which the [Housing] Authority relies and afford the Tenant an opportunity to cross-examine witnesses," and "[a]dvise the Tenant of the reasons (findings) for the decision to terminate the tenancy." *(Id.)*

30. Further, the parties intended that the procedures act as "a general outline of the procedures to be followed in the immediate future in processing proposed termination cases.... They may be hereafter ... modified," consistent with due process, "in light of experience, the volume of the case loan involved, economic considerations, and the needs of the [Housing] Authority and its tenants." *(Id.)*

31. The procedures provided by the *Escalera* Decree established four decision-making levels.

32. First, the Project Manager (the "Manager") interviews the tenant to advise him or her of the facts which led the manager to conclude that a problem exists. *(Id.)* If all efforts to resolve the problem fail, including assisting the tenant in obtaining outside help, and the Manager decides that termination of tenancy should be pursued, the Manager submits the tenant's entire file and the manager's written recommendation, with reasons stated, to the Tenancy Administrator. *(Id.)*

33. Second, the Tenancy Administrator reviews the recommendation to determine if, based on the facts and documentation which the Manager submitted, probable cause exists for eviction. *(Id.)* If probable cause exists, the Tenancy Administrator refers the entire file to the Housing Authority Legal Department for the preparation of charges and a notice to the tenant setting forth the specific grounds for the proposed termination action. *(Id.)*

34. The notice, which includes a copy of the procedures established in the *Escalera* Decree, sets a hearing date at least fifteen days after the notice is dispatched, and requests the tenant to respond in writing at least five days prior to the hearing date to indicate whether he or she intends to attend the hearing. *(Id.)* Further, it informs the tenant that he or she may seek representation by counsel or anyone else of the tenant's choice, and that the hearing is important because it may result in the tenant's eviction. *(Id.)*

35. Third, the Hearing Officer, who receives a copy of the notice, presides over the hearing. The Hearing Officer must be impartial and, prior to completing the hearing and a written decision, must not have had any access to the files, information, records, or recommendations upon which the proposed termination is based. *(Id.)* Further, the Hearing Officer must be "liberal in granting reasonable adjournments requested by the tenant ... to assure ... that the tenant is afforded every due process right." *(Id.)*

36. At the hearing, the Housing Authority attorney who prepared the charges presents the Housing Authority's side of the case, and the tenant or his or her representative presents his or her side of the case. The parties may introduce oral and written evidence, cross-examine witnesses, and subpoena documents and witnesses, and the proceedings are recorded by a mechanical recording device. *(Id.)* Further, the rules of evidence are not enforced, and the tenant may make a statement in mitigation as to why the tenancy should not be terminated. *(Id.)* This statement relates to the tenant's family situation or other extenuating circumstances which tend to show why the tenancy should not be terminated. *(Id.)*

37. The Hearing Officer then makes a written decision based solely on the oral and written evidence submitted at the hearing. *(Id.)*

38. Alternatively, if the tenant fails to reply or appear at the hearing, the Hearing Officer makes a written decision based on the record before him or her. (*Id.*) Within a reasonable time after default, however, the Hearing Officer may for good cause open the default and set a new hearing date. (*Id.*)

39. In any event, the Hearing Officer prepares a written report setting forth findings as to each charge. These findings also must include a summary of the evidence upon which they are based. (*Id.*)

40. If the Hearing Officer finds any charge to be proven, he or she shall recommend a proper disposition of the case, such as eviction, social evaluation, probation, or a stay. This recommendation may take into account any extenuating circumstances presented at the hearing, the previous record of the tenant, and the tenant's prognosis for future conduct, as evidenced by the Housing Authority's files or other reliable sources. (*Id.*)

41. The Hearing Officer forwards this report to the tenant or his or her representative, who has ten days to submit a written reply. (*Id.*)

42. Fourth, the Hearing Officer's report and the tenant's reply, if any, are submitted to the members of the Housing Authority for their final review and determination of the action to be taken. (*Id.*) A written copy of this determination is provided to the tenant or his or her representative. (*Id.*)

43. Once the Housing Authority decides to terminate the tenancy, it must serve a notice to vacate the premises by a specified date. (Aviles Aff. ¶ 15.)

44. In drug-related tenancy terminations which require a full hearing by the Housing Authority, these procedures typically require eight months. (*Id.* ¶¶ 12, 13.)

45. Some of this eight-month period is the result of adjournments and other scheduling demands. (Declaration of Judith Goldiner ("Goldiner Aff.") ¶¶ 9, 10.)

V. *Post–Administrative Judicial Proceedings*

46. If the tenant fails to vacate after the specified date, the Housing Authority must commence a summary holdover proceeding in the Housing Part of the New York City Civil Court ("holdover proceeding") to obtain a warrant of eviction. (Aviles Aff. ¶ 5.)

47. Holdover proceedings require an additional two to four months to complete. (*Id.* ¶ 16.)

48. The tenant, however, may further delay eviction by challenging the Housing Authority's administrative determination of eviction in a proceeding in New York State Supreme Court under Article 78 of the New York Civil Practice Law and Rules ("Article 78 proceeding"). (*Id.* ¶ 15.)

49. Upon filing an Article 78 proceeding, the tenant may move to stay the holdover proceeding. *See* N.Y.Civ.Prac.L. & R. § 7805 ("On the motion of any party or on its own initiative, the court may stay . . . the enforcement of any determination under review . . . .").

VI. *The Bawdy House Law*

50. RPAPL Sections 711(5) and 715 are contained in Article 7, entitled "Summary Proceeding to Recover Possession of Real Property."

51. According to Section 711(5), entitled "Grounds where landlord-tenant relationship exists,"

> a special proceeding may be maintained under this article upon the following grounds: . . . (5) [t]he premises, or any part thereof, are used or occupied as a bawdy-house, or house or place of assignation for lewd persons, or for purposes of prostitution, or for any illegal trade or manufacture, or other illegal business.

RPAPL § 711(5).

52. According to Section 715, entitled "Grounds and procedure where use or occupancy is illegal,"

> [a]n owner or tenant . . . of any premises within two hundred feet from other demised real property used or occupied in whole or in part as a bawdy-house, or house or place of assignation for lewd persons, or for purposes of prostitution, or for any illegal trade, business or manufacture,

or any domestic corporation organized for the suppression of vice, ... or any duly authorized enforcement agency of the state or of a subdivision thereof ... may serve personally upon the owner or landlord of the premises so used or occupied, or upon his agent, a written notice requiring the owner or landlord to make an application for the removal of the person so using or occupying the same. If the owner or landlord or his agent does not make such application ... the person, corporation or enforcement agency giving the notice may bring a proceeding under this article for such removal as though the petitioner were the owner or landlord of the premises.... Proof of the ill repute of the demised premises or of the inmates thereof or of those resorting thereto shall constitute presumptive evidence of the unlawful use of the demised premises required to be stated in the petition for removal.

*Id.* § 715(1).

53. In 1988, the New York County District Attorney began relying regularly on the Bawdy House Law to seek summary evictions of tenants, including Housing Authority tenants, for drug-related reasons. (Aviles Aff. ¶ 24.) Thereafter, other District Attorneys in New York City also began to bring such proceedings under the Bawdy House Law. (*Id.*)

54. The Narcotics Part of the New York City Civil Court presides over Bawdy House Law drug-eviction cases. (*Id.* ¶ 20.)

55. The typical length of a contested Bawdy House Law proceeding is two to three months. (*Id.* ¶ 21.)

56. Because a Bawdy House Law proceeding concludes with a warrant of eviction (assuming the petitioner is successful), the petitioner is not required to initiate a holdover proceeding to obtain such a warrant. (*Id.*)

57. Further, the tenant may not file an Article 78 proceeding to challenge a warrant of eviction issued in a Bawdy House Law proceeding. *See* N.Y.Civ.Prac.L. & R. § 7801 ("[A] proceeding under this article shall not be used to challenge a determination: 1. which ... can be adequately reviewed by appeal to a court or some other body ...; or 2. which was made in a civil action....").

58. Most members of the Council of Large Public Housing Authorities ("CLPHA"), of which the Housing Authority is the largest member, forego administrative hearings and prosecute narcotics evictions in a judicial forum and have thereby been successful in expediting the eviction of drug-trafficking tenants. (Affidavit of CLPHA Executive Director Maryann Russ ("Russ Aff.") ¶¶ 8, 9.)

VII. *Benefits of Market Disruption Strategy*

59. Achieving speedy evictions of drug-traffickers from Housing Authority apartments is an effective means of disrupting the drug market and thereby attacking the problems associated with drug dealing and use. (Kleinman, Tr. at 171.)

60. Although market disruption strategies are more effective with new initiates to a drug industry rather than with established users, "it is not the case that the established users are the entire market ... and it is not true that established users will be completely unaffected." (*Id.* at 205.)

61. Faster evictions "can assist in addressing the current drug epidemic as it affects New York City public housing, because the efficient and hence profitable marketing of illicit drugs requires a secure and stable location such as an apartment for sales and storage." (Kleinman Aff. ¶ 2b.)

62. In this manner, speed may be used as a tool to "accomplish the goal of shutting down an active drug dealing location." (Kleinman, Tr. at 194.)

63. The Bawdy House Law, as a mechanism for speedy evictions, can assist the

Housing Authority in its efforts to protect itself and its tenants from the burdens imposed by drug distribution within its properties, by increasing the number of specific dealing locations it is able to close down, by shortening the time between identification and termination of an active dealing location, and by eliminating a significant advantage of Housing Authority

properties for drug dealers: the unique immunity of those dealers who use Housing Authority apartments as dealing sites, from having their landlord go directly to court to seek their eviction. (Reply Declaration of Kleinman ("Kleinman Rep. Aff.") ¶ 1b.)

64. Further, speedier drug evictions under the Bawdy House Law increase "the willingness of neighbors who are aware of drug dealing activity, to bring that to the attention of the [Housing] Authority if they know that the amount of time they are going to have to live next door to somebody who may suspect them of turning them in is shorter." (*Id.* at 197–98; *accord* Affidavit of Keeney ("Keeney Aff.") ¶ 21.)

65. Actual experience has demonstrated that, as applied to Housing Authority, "evictions under the Bawdy House Law usually terminate the drug dealing connected to the apartment in question, and do not lead to an increase in violence, but rather, tend to curtail crime in the area." (Keeney Aff. ¶ 1c; *accord* Reply Affidavit of Housing Authority Manager Benjamin Hamill ("Hamill Aff.") ¶ 8; Reply Affidavit of Housing Authority Manager Gloria Finkelman ("Finkelman Aff.") ¶ 6.) [4]

66. Similarly, when a District Attorney's Office applies Bawdy House Law "procedures to two apartments in the same area within the same period, the decrease in criminal activity is even more noticeable in that area." (Keeney Aff. ¶ 31.)

67. The Bawdy House Law, in other words, results in a positive change, both physically and mentally, on the neighboring tenants and community of the evicted Housing Authority tenant. (Kleinman, Tr. at 269; Hamill Aff. ¶ 7; Finkelman Aff. ¶ 5; Reply Affidavit of Housing Authority Manager Leslie Peterson ("Peterson Aff.") ¶ 6; Reply Affidavit of Housing Authority Manager Thomas Judge ("Judge Aff.") ¶ 6.)

## VIII. Drug–Trafficking in Housing Authority Apartments

68. Since the time of the *Escalera* Decree, the Housing Authority has experienced a substantial qualitative and quantitative change in drug trafficking and the associated ailments which afflict Housing Authority projects. (Keeney, Tr. at 61; Kleinman, Tr. at 290–91, 295.)

69. Although no controlled sociological studies have been brought to my attention which provide the precise information needed (*i.e.*, the number of Housing Authority apartments in which the tenant used or acquiesced in the use of the apartment for drug trafficking in 1971, and the similar figure for 1996), the evidence in the record which is most probative of the changing conditions of Housing Authority projects convincingly supports a finding that "[i]n the last two decades, drug-related crime and drug-related violence perpetrated on Housing Authority premises has increased enormously." (Keeney Aff. ¶ 2a.)

70. That is, the testimony of longstanding Housing Authority tenants, project managers, officials, and police; Housing Authority statistics; [5] and the persuasive expert opin-

---

**4.** I was not persuaded by the Escaleras' experts Belenko and Paul Goldstein ("Goldstein"), both of whom opined that speedy evictions of drug dealers are likely to cause more violence as "turf wars" ensue. (Testimony of Belenko, Tr. ("Belenko, Tr.") at 326; Declaration of Goldstein ("Goldstein Aff.") ¶ 24.) The more persuasive testimony of those with personal knowledge of Housing Authority conditions, such as Keeney, refutes these generalized statements of theory proffered by the Escaleras' experts. (*See* Belenko, Tr. at 326, 339, 345, 346 (conceding that his conclusion is not based on any study or independent research on the use of Bawdy House Law procedures in Housing Authority projects).)

Further, the conclusions of Belenko and Goldstein suggest that eviction of a drug dealer is never a preferable drug enforcement method because once evicted, a parade of horribles ensues. (*See* Goldstein Aff. ¶ 24 (concluding that after new dealers fight over the newly available territories—the turf war—a new equilibrium is established which inevitably will be disturbed as the "original dealer, after release from jail or completion of a prison sentence, begins the violent struggle all over again").) However, absent supporting evidence that evictions of Housing Authority tenants in Bawdy House Law proceedings result in this parade of horribles, I will not make such an inference about the effectiveness of these proceedings.

**5.** In their effort to minimize the stark differences between drug trafficking in 1971 and that in 1996, the Escaleras point to various changes

ions of Kleinman support finding a significant change in factual conditions from 1971 to 1996.

### A. *1970's*

71. In the early 1970's, the primary drug with which the Housing Authority had to be concerned was heroin, which was at its peak at that time. (Keeney, Tr. at 88; Kleinman, Tr. at 278–79.)

72. Low-income heroin users and dealers, although they tend to commit other crimes to support their drug habits as do other drug users (Keeney, Tr. at 89–90; Kleinman, Tr. at 279), are relatively docile when experiencing a heroin high (Keeney, Tr. at 79). They generally "are not combative, and the addict him or herself does not really present a threat to the residency of public housing, to the tenants." (Keeney, Tr. at 79.)

73. As a consequence, "[t]he major areas of concern for the [Housing Authority] residents in the late 1960's, early 1970's, centered around robberies, centered around burglaries and centered around mainly the quality of life conditions in the developments, youths loitering in the hallways, vandalism to the elevators and the stairways and the lighting in the hallways." (*Id.* at 74–75.)

74. The concerns of the Housing Authority managers "basically paralleled the concerns of residents." (*Id.* at 82.)

75. The Housing Authority Police similarly focused its attention on "the loitering, the lingering in the lobbies, the damage to the elevators, to shrubs, even bicycle riding we attended to." (*Id.* at 76.)

76. Due to the relatively nonviolent externalities of the drug trafficking which existed at that time on Housing Authority projects, the Housing Authority Police frequently would patrol the premises alone, at night, without bulletproof vests, mace, or police radios, and with .38 caliber revolvers. (*Id.* at 81.)

77. Housing Authority statistics reveal that in 1971, for all Housing Authority projects, approximately 1,163 incidents [6] of possession and sale of all drugs occurred, approximately 210 incidents of dangerous weapons possession occurred, and in 1977 (the first year for which this statistic is available), approximately 132 incidents of possession and sale of cocaine and opium [7] occurred. (Intervenor ("Int."), Ex. 2.)

### B. *1980's*

78. In 1982 (the first year for which this statistic is available), approximately 1176 arrests reports were made by Housing Authority police for cocaine and opium possession and sales, and approximately 276 of these arrest reports involved Housing Authority tenants. (Int., Ex. 5.)

79. Then, in the summer of 1985, the Housing Authority first encountered the smokeable form of cocaine known as crack. (Keeney, Tr. at 28–29.)

80. "The appearance of crack was a quantum leap in the drug problem." (Keeney Aff. ¶ 10.)

---

during the interim which impact the usefulness of statistics showing an increase in drug activity and its associated violence in Housing Authority projects. For example, in the late 1980's, "police departments in New York City amended their policy with regard to family disputes and with regard to domestic disputes, particularly." (Keeney, Tr. at 67.) This change resulted in an increase in the number of arrests for aggravated assault. (Taylor, Tr. at 121.) Similarly, at the direction of the Federal Bureau of Investigation, the New York City Police Department changed the manner in which it maintained records for the offenses of menacing and reckless endangerment. (*Id.* at 97–98.) Finally, a larger number of families currently are living doubled-up (*i.e.,* living illegally in Housing Authority apartments without notifying the Housing Authority) than were doubled-up in the 1960's, thus altering sta-

tistics based on the population of tenants. (Keeney, Tr. at 92–93; Testimony of Housing Authority Research and Policy Development Director Mr. Steinman, Tr. at 150.) However, these changes, to the extent that they actually implicate the statistics relied upon herein, fail to account for the enormity of the increase in drug-related crime and violence experienced by the Housing Authority since the early 1970's. (Taylor, Tr. at 120–21; Kleinman, Tr. at 219–20, 294, 313.)

6. An incident is the recording of a crime on a complaint report by the category of the crime. (Keeney, Tr. at 24.)

7. The cocaine and opium category includes traditional cocaine, crack cocaine, and heroin. (Belenko, Tr. at 351.)

81. One of the major reasons for this shift is that "[t]he crack addict ... is far more combative than the heroin addict of the mid 1970's." (Keeney, Tr. at 80.)

82. As a consequence, "commencing in 1985 there was a dramatic increase in the amount of crime and violence in the public housing developments throughout the city." (Keeney, Tr. at 30.)

83. These crack traffickers use their Housing Authority Apartments to prepare, sell, store, and use the drug. (Affidavit of Taylor ("Taylor Aff.") ¶¶ 10–18; Keeney Aff. ¶¶ 24–25.) Apartments used by groups to smoke crack commonly are referred to as "crack houses." (Keeney, Tr. at 79.)

84. Further, crack traffickers (as well as other drug traffickers) "routinely commandeer elevators, stairways, hallways, and building entrances. Dealers and users intentionally jam the elevators between floors for extensive periods of time to insure privacy for the completion of their criminal transactions and to avoid arrest." (H–P Aff. ¶ 18; *accord* Keeney, Tr. at 79–80; Affidavit of Housing Authority Tenant Gerri Lamb ("Lamb Aff.") ¶ 17.)

85. Crack dealing "tends to transform the neighborhood into a war zone, where the residents go outside only when they must, and are otherwise virtually prisoners in their home." (Kleinman Aff. ¶ 23.)

86. To make matters worse, "the numbers of people who were buying crack cocaine [on Housing Authority premises] were much larger than the numbers of people who were buying heroin in the mid 1970's." (Keeney, Tr. at 80.)

87. "[T]oward 1988 and 1989 the level of violence that was associated with that crack dealing [in Housing Authority projects] escalated dramatically." (*Id.* at 77.)

C. *1990's*

88. By 1991 or 1992, largely due to the introduction of crack to Housing Authority projects in 1985, the crime rate in the Housing Authority surpassed that in the City of New York in general. (Keeney, Tr. at 39–40.)

89. In 1993, approximately 6,246 incidents of possession and sale of all drugs, 5,388 incidents of possession and sale of cocaine and opium, and 399 incidents of dangerous weapons possession occurred on Housing Authority projects. (Int., Ex. 2.)

90. Although some of these 1993 statistics are lower than their peak in 1989, the 1993 rate of drug offenses in Housing Authority projects "abated only slightly from the record levels of 1989" (Kleinman Aff. ¶ 26) and are considerably higher than the corresponding statistics from the 1970's (Int., Ex. 2).

91. By 1994, approximately 11,913 arrest reports were made by Housing Authority police for cocaine and opium possession and sales, and approximately 5,530 of these arrest reports involved Housing Authority tenants. (Int., Ex. 5.)

92. The drug epidemic brought on by the introduction of crack remains a problem of the Housing Authority today. (Kleinman, Tr. at 303–04.)[8] This violence is significantly greater than any violence associated with heroin and powder cocaine that were found in the Housing Authority projects in 1971. (Kleinman, Tr. at 306.)

93. Further, it is far from certain that the Housing Authority is beyond the peak of crack consumption (*id.* at 237), and "[t]he suggestion that the cocaine epidemic is behind us and, therefore, we needn't worry about it is clearly refuted" by relevant statistics (*id.* at 316–17).

94. Consistent with this unfortunate reality is the fact that Housing Authority homicide rates, which generally are reliably related to drug-activity (*id.* at 44) reveal that "the level of homicide activity in the Housing Authority is still way above its early 1970's levels" (*id.* at 248).

---

**8.** I found Dr. Kleinman's testimony on the vast increase in drug trafficking and drug-related crime between the early 1970's and the present and the reasons therefor to be particularly persuasive. This is based both on his knowledge and experience in the relevant area—acquired through personal experience in Housing Authority communities and through research—and upon his demeanor while testifying.

95. In addition to the impact of crack, the Housing Authority is faced with the continuing problems associated with heroin, for "[a]t the moment ... [t]he heroin market is growing," and "the heroin problem remains a substantial one even before the new wave that is just hitting us now." (*Id.* at 206, 233.)

96. As a result of this dramatic qualitative and quantitative change in the drug environment of Housing Authority projects, present tenant concerns center "around the narcotics and drug conditions" which exist in the public housing developments. (Keeney, Tr. at 75.) Tenants today are "[f]ar and away more concerned with the violence of the presence of crack ... than with heroin in the 1970's." (*Id.* at 80; *accord* H-P Aff. ¶ 22; Lamb Aff. ¶ 10.)

97. Housing Authority tenants have become so concerned with the current drug trafficking and its related violence that they have created safe zones or travel paths that are patrolled by police or parents to ensure that children can travel to and from school safely. (Reply Affidavit of Housing Authority Manager Salvatore Tortora ("Tortora Aff.") ¶ 5.)

98. Housing Authority managers share these tenant concerns. (Keeney, Tr. at 82; Reply Affidavit of Housing Authority Manager Andrea Cohn ("Cohn Aff.") ¶ 4.)

99. Similarly, because the Housing Authority Police is "very heavily confronted with narcotics, narcotics suppression, drive-by shootings, random gun fire in the public housing developments," police officers patrol the Housing Authority projects "armed with a 9-millimeter, high capacity firearm," they wear bulletproof vests, have police radios, carry mace, and have partners. (Keeney, Tr. at 76, 81.)

100. "Because the current drug crisis is so vastly different from any previous drug epidemic," (Kleinman Aff. ¶ 31), "[i]t is clear that something over the last 25 years has very badly impacted the Housing Authority crime situation...." (Kleinman, Tr. at 219).

101. Finally, I am persuaded that the Housing Authority did not anticipate this vast change in conditions at the time it entered into the *Escalera* Decree. (Kleinman Aff. ¶ 31.)

## CONCLUSIONS OF LAW

102. The Housing Authority has moved for an order allowing it "to proceed directly under the Bawdy House Law in that narrow category of cases where the tenant of record participates or acquiesces in the use of a public housing apartment for drug trafficking." (Housing Authority's Memorandum of Law in Support of its Motion for an Order Modifying the Escalera Decree ("Supp. Mem."), at 11.)

## I. *Escalera Decree Prohibits Resort to Bawdy House Law*

103. As an initial argument, the Housing Authority asserts that a proper construction of the *Escalera* Decree does not prohibit it from bringing a summary eviction proceeding directly under the Bawdy House Law.[9]

---

9. The Escaleras, in addition to disagreeing with this construction of the *Escalera* Decree, assert that another decree—the *Tyson—Randolph* Decree—also prohibits the Housing Authority from relying on the Bawdy House Law procedures.

Joseph Tyson, Sr. and Myrdes Randolph were named class members of a consolidated class action before Judge Charles M. Metzner of this Court against the Housing Authority by all Housing Authority tenants who were or may have become subject to termination of their tenancies on the ground on non-desirability. (Aviles Aff., Ex. C.) On October 17, 1975, the parties to this consolidated class action entered into a Stipulation of Partial Settlement, and on December 18, 1975, they entered into a Stipulation of Final Settlement of Consolidated Class Actions. (*Id.*) On January 26, 1976, these stipulations became a consent judgment of Judge Metzner (collectively, the *"Tyson—Randolph* Decree"). (*Id.*)

The *Tyson—Randolph* Decree prevents the Housing Authority from bringing a termination of tenancy proceeding
> against any tenant based upon a charge that an adult child of said tenant or other person has engaged in allegedly non-desirable activity which occurred at a time when the adult child or other person did not reside with the tenant, and no determination of the ineligibility of a tenant for continued occupancy in public housing shall be based in whole or in part upon the non-desirable activity of an adult child of the tenant or other person which occurred at a time when said child or other person did not reside with the tenant.

104. I am not persuaded by the Housing Authority's proffered construction of the *Escalera* Decree.

105. "[C]onsent decrees 'have attributes both of contracts and of judicial decrees,' a dual character that has resulted in different treatment for different purposes." *Local Number 93 v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986) (quoting *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975)).

106. A consent decree "is to be construed ... basically as a contract." *ITT Continental,* 420 U.S. at 238, 95 S.Ct. at 935; *accord Crumpton v. Bridgeport Educ. Ass'n,* 993 F.2d 1023, 1028 (2d Cir.1993). "[I]t is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." *Local Number 93,* 478 U.S. at 522, 106 S.Ct. at 3075.

107. As with a contract, therefore, "the scope of a consent decree must be discerned within its four corners." *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), *quoted by Crumpton,* 993 F.2d at 1028.

108. Accordingly, "[i]t is the language of a consent decree that defines the obligations of the parties," *United States v. O'Rourke,* 943 F.2d 180, 187 (2d Cir.1991), and a court must construe it "as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation," *Armour,* 402 U.S. at 682, 91 S.Ct. at 1757.

109. Nor should a court construe the decree by reference to what might satisfy the purposes of one of the parties to it, because

[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*Armour,* 402 U.S. at 681–82, 91 S.Ct. at 1757 (emphasis in original).

The Housing Authority brought this action solely to construe or modify the *Escalera* Decree. As a consequence, the Notice of Hearing, which provided to the class members the dates and times for the Hearing and instructions on submitting written comments, referred only to the clarification or modification of the *Escalera* Decree. Similarly, the post-Hearing letters distributed to those class members who submitted written comments referred only to the clarification or modification of the *Escalera* Decree. Finally, because the *Tyson—Randolph* Decree was entered in a different action with different named plaintiffs and intervenors, it is not clear that I may modify it in this action upon the submissions of the parties currently before me.

Accordingly, I render no holding as to the relationship between the *Tyson—Randolph* Decree and the Bawdy House Law. To the extent that the *Tyson—Randolph* Decree is inconsistent with the Bawdy House Law and the Housing Authority remains bound by the *Tyson—Randolph* Decree, the resolution of this controversy must be addressed in a later proceeding.

(*Id.*) Further, it added to the list of authorized dispositions of a termination of tenancy proceeding the category of "eligible subject to permanent exclusion of one or more persons in the household"; it requires "a decision of 'eligible', 'probation,' or 'eligible subject to permanent exclusion of one or more persons in the household'" when the offending party has been removed from the household; and it requires that probation must be given when the offending member of the household is absent (*e.g.,* confined in jail, away in the Armed Services, or participating in a residual drug program). (*Id.*) These requirements of the *Tyson—Randolph* Decree, along with those of the *Escalera* Decree, have been incorporated into the Housing Authority's current termination of tenancy procedures. (Aviles Aff. ¶ 7.)

Although the Escaleras argue that the *Tyson—Randolph* Decree also prohibits the Housing Authority's use of the Bawdy House Law procedures, I will not address either this contention or, assuming the Escaleras are correct in this assertion, the related issue of whether I should modify the *Tyson—Randolph* Decree in this action.

110. The "four corners rule" applies equally to "both the consent decree and [any documents] incorporated into the decree by reference." *Crumpton,* 993 F.2d at 1029. These documents "become an intrinsic part" of the consent decree. *Id.* at 1028.

111. "Extrinsic evidence should only be considered when the decree itself is ambiguous." *E.E.O.C. v. Local 40,* 76 F.3d 76, 80 (2d Cir.1995); *accord O'Rourke,* 943 F.2d at 187 (" 'Extrinsic evidence . . . may generally be considered only if the terms of the judgment, or of documents incorporated in it, are ambiguous.' ") (quoting *SEC v. Levine,* 881 F.2d 1165, 1179 (2d Cir.1989)).

112. After applying the foregoing principles, I construe the *Escalera* Decree, as it presently exists, to preclude the Housing Authority from utilizing the Bawdy House Law procedures to remove its tenants who use or acquiesce in the use of their apartments for drug trafficking.

113. The express terms of the *Escalera* Decree demonstrate that it and the Bawdy House Law address the same problem and achieve the same result; they address the problem of drug-trafficking tenants and provide for the eviction of these tenants from public housing.[10] They are distinguished only by the procedure and underlying legal theory employed.

114. Pursuant to the *Escalera* Decree, the Housing Authority terminates a non-desirable[11] tenant's lease by instituting a termination of tenancy proceeding. *See Escalera,* 425 F.2d at 857 ("Leases are terminated . . . if the tenant is found to be non-desirable"). Further, as the notice of the termination hearing—which is delivered pursuant to the *Escalera* Decree to a tenant facing charges from the Housing Authority—indicates, "THE DETERMINATION BASED [ON THE HEARING] MAY RESULT IN YOUR EVICTION." (Aviles Aff., Ex. A (emphasis in original).)

115. The Bawdy House Law similarly addresses the problem of drug trafficking and achieves the result of eviction. It provides for the institution of a summary proceeding to "apply for the removal of a person occupying demised real property under circumstances enumerated in the statute, *i.e.,* for an illegal business use." *Woodin v. Lane,* 119 A.D.2d 969, 501 N.Y.S.2d 495, 497 (3d Dept. 1986); *accord* RPAPL §§ 711, 715, 749; *see* Housing Authority's Reply Memorandum of Law in Support of its Motion for an Order Clarifying or Modifying the Escalera Decree ("Rep.Mem.") at 24 (referring to this approach as the "Bawdy House Law eviction proceedings").

116. However, the Bawdy House Law, in addition to using different procedures to evict drug-trafficking tenants (*i.e.,* its summary procedures), relies on a different legal theory from that relied on under the *Escalera* Decree. The Bawdy House Law "is not predicated on a termination of the tenancy." *Jackson Terrace Assocs. v. Patterson,* 159 Misc.2d 637, 611 N.Y.S.2d 430, 430 (N.Y.App. Term.1994). Instead, it is "based upon a violation of law and not upon the violation of a lease agreement and therefore it is not necessary to terminate the lease." *Kings County Dist. Attorney's Office v. Underwood,* 143 Misc.2d 965, 543 N.Y.S.2d 247, 249 (N.Y.Civ.Ct.Kings Co.1989); *accord Kellner v. Cappellini,* 135 Misc.2d 759, 516 N.Y.S.2d 827, 830 (N.Y.Civ.Ct.N.Y.Co.1986). In a Bawdy House Law proceeding, in other words, "the lease is deemed void;" it is not merely breached. *New York County Dist. Attorney's Office v. Oquendo,* 147 Misc.2d 125, 553 N.Y.S.2d 973, 976 (N.Y.Civ.Ct. N.Y.Co.1990).

117. These distinctions of procedure and legal theory, however, do not alter the reality that within the four corners of the *Escalera* Decree the Housing Authority, in order to evict drug-trafficking tenants, unambiguously agreed to adopt a different set of procedures

---

**10.** I recognize that the *Escalera* Decree and the Bawdy House Law also address other scenarios, but the scenario involving drug trafficking in Housing Authority apartments is the only one at issue in the instant case.

**11.** The ground of non-desirability is the one used by the Housing Authority to evict tenants for drug-related reasons. *See Escalera,* 425 F.2d at 859 (discussing a termination proceeding on the ground of non-desirability due to a tenant's arrest on a narcotics charge).

and a different legal theory from those adopted by the Bawdy House Law.[12]

118. For the Housing Authority's argument to prevail, I would have to construe the language of the *Escalera* Decree to accord the Housing Authority the unilateral option of either applying its allegedly cumbersome administrative procedures to drug-trafficking cases or proceeding in these cases under the summary procedures of the Bawdy House Law to achieve the same result. The four corners of the *Escalera* Decree, however, fail to support such a construction. *See Crumpton,* 993 F.2d at 1030 ("Clearly one party to a consent decree cannot unilaterally rewrite the agreement over another party's objections in order to pursue a course of action favored by it but detrimental to the opposing party, where the course of action is not authorized by the consent decree.").

119. Further, the omission of any language expressly providing the Housing Authority with the ability to proceed under the Bawdy House Law is particularly persuasive in light of the fact that, as the Housing Authority admits, "[t]he Bawdy House Law predated the Escalera Decree by a century." (Rep.Mem. at 17 (emphasis in original).)[13]

120. Finally, even the Housing Authority has recognized "that the Escalera Decree might be construed to require the Housing Authority to conclude an administrative proceeding prior to resort to housing court." (Supp.Mem., at 11); *see Underwood,* 543 N.Y.S.2d at 249 (noting that the Housing Authority, when requested by the Kings County District Attorney's Office to commence a Bawdy House Law proceeding, "replied that at this time it regrettably was unable to comply with the request due to the consent Order entered on March 25, 1971 in Escalera").

121. Accordingly, I deny the Housing Authority's motion for an order declaring that the *Escalera* Decree does not prevent it from proceeding under the Bawdy House Law, even "in that narrow category of cases where the tenant of record participates or acquiesces in the use of a public housing apartment for drug trafficking." (Supp.Mem., at 11.)

II. *Modification of Escalera Decree is Warranted*

122. Alternatively, the Housing Authority asserts that I should modify the *Escalera* Decree to permit the Housing Authority to proceed directly under the Bawdy House Law in drug-trafficking cases.

123. According to Rule 60(b)(5), "upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) ... it is no longer equitable that the judgment should have prospective application." Fed.R.Civ.P. 60(b)(5).

124. In *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court expounded on Rule 60(b)(5) in the context of modifying an institutional reform consent de-

---

12. The Housing Authority relies heavily on *New York County Dist. Attorney's Office v. Oquendo,* 147 Misc.2d 125, 553 N.Y.S.2d 973 (N.Y.Civ.Ct. N.Y.Co. 1990) to argue that the *Escalera* Decree does not prevent the Housing Authority from utilizing the Bawdy House Law in lieu of its administrative procedures. (Supp.Mem., at 17–18; Rep.Mem., at 20, 22.) *Oquendo,* however, interprets the Court of Appeals opinion from *Escalera,* not the *Escalera* Decree. *Oquendo,* 147 Misc.2d 125, 553 N.Y.S.2d at 976.

13. The Housing Authority, however, argues from this omission that, in light of the Court of Appeals' statement in *Escalera* that the "actions here are not entangled in state law," *Escalera,* 425 F.2d at 865, "it was even more incumbent upon [the Escaleras] to clearly spell out that, notwithstanding the Second Circuit's assessment, the *Escalera* Decree was indeed entangled in state law," (Rep.Mem., at 16).

I disagree. The Court of Appeals made this statement in the context of the Housing Authority's argument that the Court of Appeals should abstain to allow the claims before it to be resolved in the first instance by New York State courts. *Escalera,* 425 F.2d at 865. The Court of Appeals merely reaffirmed that, because "the only issues here are whether certain [Housing Authority] procedures pass muster under the due process clause," it was quite competent to vindicate these federal rights. *Id.* It did not render an interpretation of the relationship between the *Escalera* Decree, which was not yet in existence, and the laws of the State of New York.

cree.[14]

125. The Court first discussed the policy of flexibility behind allowing modification of these decrees. "Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Id.* at 380, 112 S.Ct. at 758.

126. Further, "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Id.* at 381, 112 S.Ct. at 759 (quoting *Heath v. DeCourcy*, 888 F.2d 1105, 1109 (6th Cir.1989)).

127. For these reasons, the Court held "that a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree." *Rufo*, 502 U.S. at 383, 112 S.Ct. at 760; *see United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir.1995) ("*Rufo* teaches that the power of a court to modify or terminate a consent decree is, at bottom, guided by equitable considerations.").

128. The Court also held, however, that limits exist to this flexibility and that modification is not warranted in all circumstances. *Rufo*, 502 U.S. at 383, 112 S.Ct. at 759–60.

129. Rule 60(b)(5) requires more than a showing that "it is no longer convenient to live with the terms of a consent decree." *Id.* Instead, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*

**A. Significant Change in Circumstances**

130. "A party seeking modification of a consent decree may meet its initial bur-

den by showing either a significant change in factual conditions or in law." *Id.* at 384, 112 S.Ct. at 760.

131. The Escaleras argue that due to the absence of a significant change in facts or law, I may not modify the *Escalera* Decree to allow the Housing Authority to utilize the Bawdy House Law procedures, even if limited to a narrow category of cases.

**1. Significant Change in Factual Conditions**

132. The *Rufo* Court articulated three methods by which a moving party may justify modification based on a significant change in factual conditions.

133. First, the movant may show that "changed factual conditions make compliance with the decree substantially more onerous." *Id.*

134. Although "[l]itigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree," modification ordinarily "should not be granted where a party relies upon events that *actually* were anticipated at the time it entered into a decree." *Id.* at 385, 112 S.Ct. at 760 (emphasis added).

> If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy the heavy burden to convince the court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

*Id.*

135. Further, when government officers in charge of institutional litigation agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation, a court

> should surely keep the public interest in mind in ruling on a request to modify

**14.** As the Court explained, this standard "applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right." *Rufo*, 502 U.S. at 383 n. 7, 112 S.Ct. at 760 n. 7. It does not apply when a party seeks to "implement minor changes in extraneous details that may have been included in a decree." *Id.*

based on a change in conditions making it substantially more onerous to abide by the decree. To refuse modification of a decree is to bind all future officers of the State, regardless of their view of the necessity of relief from one or more provisions of a decree that might not have been entered had the matter been litigated to its conclusion.

*Id.* at 392, 112 S.Ct. at 764.

136. An example of this ground of modification is when, due to an unforeseen explosion in the population of pretrial detainees, it becomes substantially more onerous to build a jail which houses all of the detainees and still maintains single-cell occupancy, as required by the consent decree which addresses the constitutionality of the jail conditions. *Id.* at 384, 112 S.Ct. at 760.

137. Second, "[m]odification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles." *Id.*

138. Such an obstacle may include, for example, the inability of a residential school for the mentally retarded to relocate many of its residents to specifically defined community placements because of difficulties encountered, due to an extremely tight housing market, in finding residences that satisfy the specifications of the consent decree. *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 965 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983), *cited by Rufo,* 502 U.S. at 384, 112 S.Ct. at 760.

139. Third, modification is appropriate "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo,* 502 U.S. at 384, 112 S.Ct. at 760.

140. For example, a court may modify a consent decree which forbids double bunking in a county jail if, due to a rapid growth in the number of people charged with crime in the county, "some 500 accused felons would be released on their own recognizance" in under two months if the county could not house two inmates per cell in some cells.

*Duran v. Elrod,* 760 F.2d 756, 760 (7th Cir. 1985), *cited by Rufo,* 502 U.S. at 384–85, 112 S.Ct. at 760–61.

141. The Housing Authority argues that since 1971, when the parties entered into the *Escalera* Decree, "there has been a dramatic increase in illegal drug trafficking and use and drug-related crime ... in New York's public housing." (Supp.Mem., at 21.) A major cause of this profound change in the drug scene, according to the Housing Authority, has been the emergence of crack cocaine. (Rep.Mem. at 10.) It represents a "scourge in Housing Authority communities." (*Id.* at 7.) This scourge constitutes a significant change in factual conditions, thus warranting modification of the *Escalera* Decree.

142. The Escaleras, however, argue that "[d]espite an enormous amount of hyperbole in the media and elsewhere, the consensus of opinion among leading experts on drugs and criminal behavior is that no such change in fact has occurred since 1971." (Plaintiff's Memorandum of law in Opposition to Defendants' Motion to Modify the Escalera Decree ("Opp.Mem.") at 38.) In fact, the Escaleras assert that "the trade in crack cocaine in the late 1980's is no more virulent or associated with violence than the heroin and powdered cocaine epidemics of the 1970's." (*Id.*)

143. I find that the Housing Authority has met its initial burden by showing a significant change in factual conditions.

144. It has shown that continued compliance with the *Escalera* Decree, because the qualitative and quantitative changes in the narcotics trafficking in Housing Authority communities, has become substantially more onerous and is detrimental to the public interest.

145. As more fully discussed above,[15] the Housing Authority has demonstrated a significant and unanticipated increase in the number of tenants who use or acquiesce in the use of their public housing to traffic in controlled substances, most notably crack cocaine.

146. It also has demonstrated that the current drug scene, relative to that in the

---

**15.** *See supra* ¶¶ 68–101.

early 1970's, is overwhelmed with drug-related violence and other drug-related crimes.

147. Therefore, compliance with the *Escalera* Decree's extensive administrative requirements and the judicial proceedings which inevitably follow the Housing Authority's proceedings has become substantially more onerous.

148. The substantially changed drug environment on Housing Authority premises also renders continued compliance with the *Escalera* Decree in this context detrimental to the public interest.

149. Because of the time required to evict drug trafficking tenants under the *Escalera* Decree, the Housing Authority has become handicapped in its ability to fulfill its obligations to provide "decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437; *accord* N.Y.Pub.Hous.Law § 2.

150. Because of that handicap, tenants who are neighbors to drug traffickers, whether these tenants are single adults, single-parent families, traditional nuclear families, or extended families (the last three with young impressionable children), often must withstand home environments littered with violence and the other ills associated with the trafficking of narcotics.

151. Further, other low-income applicants who desire to live in Housing Authority apartments suffer unjust prejudice by the Housing Authority's inability to address swiftly the current epidemic of drug-traffickers in Housing Authority apartments.

152. The Housing Authority maintains almost a zero percent vacancy rate in its apartments. (H–P Aff. ¶ 13.) Therefore, every apartment occupied by a drug-trafficker is one less apartment which a law-abiding[16] applicant can possess.

153. Compliance with the *Escalera* Decree's termination of tenancy procedures, therefore, has become substantially more onerous, and continued enforcement of these procedures without modification is detrimental to the public interest.

## 2. *No Significant Change in Law*

154. The *Rufo* Court also discussed two methods by which a moving party may justify modification based on a significant change in law. Although this inquiry is not dispositive due to my finding of a significant change in factual conditions, I will discuss it briefly.

155. First, if "one or more of the obligations placed upon the parties has become impermissible under federal law," a court must modify the consent decree. *Rufo*, 502 U.S. at 388, 112 S.Ct. at 762.

156. Second, a court may modify a consent decree if "statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id.* States and local governments, however, can settle disputes by "undertaking to do more than the Constitution itself requires" and more than a court would have ordered had the case proceeded to a trial on the merits. *Id.* at 389, 112 S.Ct. at 762–63. In fact, "almost any affirmative decree beyond a directive to obey the Constitution necessarily does that." *Id.*

157. A mere clarification in the law, however, does "not, in and of itself, provide a basis for modifying a decree." *Id.* at 390, 112 S.Ct. at 763. For example, a Supreme Court case which announces, for the first time, that double celling of pretrial detainees is not unconstitutional in all cases, is not necessarily a sufficient change in law to warrant modification of a decree in which a county agrees to build a new jail with single occupancy cells. *Id.* at 388, 112 S.Ct. at 762.

158. "If the parties had based their agreement on a misunderstanding of the governing law," however, a decision that clarifies the law may "constitute a change in circumstances that would support modification." *Id.* at 390, 112 S.Ct. at 763. For example, if the county in the previous example established that "the parties to the consent decree believed that single celling of pretrial detainees was mandated by the Constitution, this

---

16. Contrary to the Escaleras' implicit suggestion (Tr. at 199–200), I will not assume, without supporting evidence, that all or even most drug-trafficking tenants evicted from a Housing Authority apartment will be replaced by a drug-trafficking tenant from the waiting list.

misunderstanding of law could form a basis for modification." *Id.*

■ 159. To support its proposed modification, the Housing Authority relies on an increased application by the New York County District Attorney's Office of the Bawdy House Law in drug-trafficking evictions, and a 1990 Amendment to the United States Housing Act of 1937 which eliminated the requirement of an administrative hearing in these evictions.

160. These events, however, fail to constitute a change of law from 1971 to 1996.

161. At the time the parties entered into the *Escalera* Decree, the State of New York already had enacted the Bawdy House Law. *See* RPAPL § 711(5), 715 (historical note).

162. The Bawdy House Law remains in effect at present. *Id.*

163. The Housing Authority has proffered no legal authority for its proposition that an increased application of an existing law constitutes a change in law sufficient to warrant modification.

164. Nor has the Housing Authority proffered legal authority which imposed upon it an obligation at the time the parties entered into the *Escalera* Decree to provide administrative hearings in drug eviction cases.

165. Only in 1975 did the Department of Housing and Urban Development ("HUD") promulgate regulations requiring hearings in public housing eviction cases. *See* 40 Fed. Reg. 33406 (1975) (codified at 24 C.F.R. §§ 966.50–966.57).

166. In 1983, Congress amended the United States Housing Act of 1937 to require all public housing authorities to establish and implement administrative grievance procedures. *See* 42 U.S.C. § 1437d(k) (historical and statutory notes).

167. In 1990, Congress again amended the United States Housing Act of 1937. This amendment authorized public housing authorities to forego their administrative hearing procedures in favor of a judicial proceeding "[f]or any grievance concerning an eviction or termination of tenancy that involves any criminal activity that threatens the health, safety, or right of peaceful enjoy-

ment of the premises of other tenants or employees of the public housing agency or any drug-related criminal activity on or near such premises," and provided that the housing authority is in a "jurisdiction which requires that prior to eviction, a tenant be given a hearing in court which the Secretary [of HUD] determines provides the basic elements of due process." *Id.*

168. In 1991, HUD Secretary Jack Kemp issued a determination that judicial proceedings under New York's Bawdy House Law provide the basic elements of due process (Aviles Aff., Ex. E), thus allowing (independent of limitations imposed by the *Escalera* Decree) the Housing Authority to forego administrative hearings in drug-trafficking evictions.

169. Therefore, just as HUD statutes and regulations did not impose upon the Housing Authority a legal obligation in 1971 to conduct such hearings in drug-trafficking cases, these statutes and regulations do not impose such an obligation at present.

170. Accordingly, the Housing Authority has failed to demonstrate a change in law warranting modification of the *Escalera* Decree.

**B. *Bawdy House Law Modification is Suitably Tailored***

171. In light of my finding of a significant change in factual conditions, however, it is necessary to address the second prong of the *Rufo* test.

172. "Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the District Court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo,* 502 U.S. at 391, 112 S.Ct. at 763.

173. The Escaleras assert that even if a significant change in factual conditions has occurred, the procedures mandated by the *Escalera* Decree should be streamlined in drug-trafficking evictions, rather than entirely abandoned in favor of the Bawdy House Law.

174. In determining whether a proposed modification is suitably tailored, a court should adhere to three principles.

175. First, "a modification must not create or perpetuate a constitutional violation." *Id.*

176. Second, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." *Id.* "[T]he focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Id.*

177. Third, principles of federalism "require that the district court defer to local government administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Id.* at 392, 112 S.Ct. at 764 (quoting *Brown v. Board of Educ.*, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)). The court should give the views of these local government administrators "significant weight." *Rufo*, 502 U.S. at 392 n. 14, 112 S.Ct. at 764 n. 14. This includes the government officials' concerns regarding financial constraints, for they "are appropriately considered in tailoring a consent decree modification." *Id.* at 392–93, 112 S.Ct. at 764.

178. I hold that modification of the *Escalera* Decree to allow the Housing Authority to proceed under the Bawdy House Law when a tenant participates or acquiesces in the use of his or her Housing Authority apartment for drug-trafficking is a suitably tailored modification.

179. First, reliance on the Bawdy House law—a lawfully enacted statute of the State of New York—in a particular subset of evictions does not create or perpetuate a constitutional violation.

180. The Escaleras have proffered no legal authority holding the Bawdy House Law

unconstitutional on its face or as applied to drug-related evictions. *See Geronimo v. City of New York*, No. 91 Civ. 1755 (LBS), 1991 WL 254426, at *1 (S.D.N.Y. Nov. 15, 1991) (rejecting the plaintiff's challenge to the constitutionality of the summary eviction proceedings under RPAPL Article 7 where "no persuasive grounds are asserted why proceedings pursuant to that law deny any constitutional rights"), *aff'd*, 28 F.3d 102 (2d Cir.1994).

181. Instead, the Escaleras simply allege that tenants facing eviction under the Bawdy House Law would lose various protections which they retain under the *Escalera* Decree. They attempt to support their allegation by noting, for example, that evidentiary and procedural rules are applicable to a Bawdy House Law proceeding, and are not in an *Escalera* Decree proceeding. (Opp.Mem. at 32.)

182. This comparison, however, does nothing more than identify an obvious and necessary consequence of any modification of the *Escalera* Decree—that certain features of the eviction process will change. *See Kozlowski v. Coughlin*, 871 F.2d 241, 248 (2d Cir.1989) ("[A]ny justifiable modification 'will perforce alter some aspect of the decree.'") (quoting *New York State Ass'n for Retarded Children*, 706 F.2d at 969). Without such changes, a modification would be unnecessary and the Housing Authority would not have filed this action.

183. Further, I will not impose a *per se* rule, as the Escaleras' would have me do, that any changes which are unfavorable to tenants are unconstitutional.[17]

184. Finally, my own examination of the Bawdy House Law does not reveal that it denies tenants constitutionally secured rights.

185. The Bawdy House Law "clearly was intended to protect the health, welfare and safety of the public residing in the same community as well as the tenants who reside in the same building ... and thus serve[s] a legitimate civil and remedial purpose." *City*

---

17. In any event, I am not persuaded that changes such as the application of evidentiary and proce-

dural rules necessarily are unfavorable to tenants.

*of New York v. Wright,* 162 Misc.2d 572, 618 N.Y.S.2d 938, 939 (N.Y.App.Term 1994) (per curiam).

186. The Bawdy House Law is not a tool to evict innocent tenants or to impose vicarious liability on tenants for the conduct of others. *See Marwyte Realty Assoc. Ltd. Partnership v. Valcarcel,* 150 Misc.2d 1044, 579 N.Y.S.2d 311, 312 (N.Y.App.Term 1991) (per curiam) (holding that a landlord could not evict a tenant on the basis that two of her emancipated children had been arrested for narcotics offenses in or about the building premises where no drugs were recovered from the apartment, there was no claim of misconduct on the part of the tenant, the tenant testified that she had no knowledge of her adult children's involvement with narcotics, and the children did not reside with her); *Grosfeld Realty Co. v. Lagares,* 150 Misc.2d 22, 575 N.Y.S.2d 220, 220 (N.Y.App.Term 1989) (per curiam) (holding that "a landlord failed to establish by prevailing evidence that the apartment premises was used or occupied for illegal purposes so as to warrant eviction" where "the tenant's son (the party responsible for the claimed illegal activity) had vacated the apartment premises prior to commencement of the proceeding"); *Kings County Dist. Attorney's Office v. Freshley,* 160 Misc.2d 302, 608 N.Y.S.2d 788, 793 (N.Y.Civ.Ct.Kings Co.1993) (dismissing the District Attorney's petition because the District Attorney failed to prove that a Housing Authority tenant "had knowledge and/or acquiesced" in the use of the apartment by others to conduct three separate crack sales); *Humane Soc'y v. Joad Enters., Inc.* 65 Misc.2d 8, 316 N.Y.S.2d 868, 869 (N.Y.Civ.Ct. N.Y.Co.1970) ("The fact that several people were arrested on the [tenant's] premises for criminal acts committed without the [tenant's] knowledge or acquiescence will not justify a forfeiture of the lease.").

187. Even the Escaleras recognize that if there is "a completely innocent tenant," "then there would be no Bawdy House case." (Tr. at 208.)

188. Nor does the Bawdy House Law allow eviction based on isolated incidents. *See Lituchy v. Lathers,* 35 Misc.2d 556, 232 N.Y.S.2d 627, 627 (N.Y.App.Term 1962) (per curiam); *1021-27 Ave. St. John Housing Dev. Fund Corp. v. Hernandez,* 154 Misc.2d 141, 584 N.Y.S.2d 990, 992 (N.Y.Civ.Ct.Bronx Co. 1992) (both holding that "the term 'use' of the premises for illegal purposes implies doing of something customarily or habitually upon the premises").

189. With respect to procedural constitutional concerns, the Housing Authority has represented that, it "would, as petitioner in a [Bawdy House Law] proceeding, continue to make available on request the tenant folder for inspection." (Reply Affidavit of Aviles ("Aviles Rep. Aff.") ¶ 12.)

190. Similarly, the tenant's violation must be proven by the petitioner in a trial before a court and, if requested, a jury, RPAPL § 745(1), the tenant may seek an adjournment "to procure his necessary witnesses," *id.,* and the tenant receives constitutionally adequate notice of the proceedings through service of a petition, *see Velazquez v. Thompson,* 451 F.2d 202, 204, 206 (2d Cir.1971) (holding, where the tenants "mounted a broadside constitutional attack on [RPAPL Article 7]," that the notice provision of RPAPL Article 7 "is carefully drafted and calculated to apprise tenants of the pendency of the action is not vulnerable to constitutional attack.") (interpreting the substantially similar 1971 version of RPAPL § 735).

191. Based on my overview of the Bawdy House Law, therefore, the Housing Authority's reliance on this statute in drug-trafficking evictions does not create or perpetuate a constitutional violation.[18] *See City of New York v. Goldman,* 78 Misc.2d 693, 356 N.Y.S.2d 754, 759 (N.Y.Civ.Ct.N.Y.Co.1974) (holding that an argument that the Bawdy House Law is unconstitutional "has no merit," for if the landlord "shows that the [tenant's] possession and use is illegal, then there is no constitutional right to continue in occupancy").

---

18. My holding of the Bawdy House Law's constitutionality is limited, by necessity, to an examination of the face of the statute; I do not purport to hold that no set of facts exists in which an application of the Bawdy House Law is unconstitutional.

192. Second, the proposed modification to the *Escalera* Decree is sufficiently tailored to resolve the problems created by the change in factual circumstances.[19]

193. The Escaleras argue that any modification should consist only of streamlining the *Escalera* Decree to shorten the time required to effectuate the eviction.

194. They suggest, for example, that the initial tenant interview be eliminated, that the Housing Authority Law Department expedite its preparation of charges, and that the Housing Authority schedule fewer and shorter adjournments. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 38.)

195. I disagree that such tinkering with the *Escalera* Decree sufficiently would resolve the problems created by the significant change in factual conditions experienced by the Housing Authority.

196. The change in the drug culture on Housing Authority projects requires expedited proceedings to rid the Housing Authority of drug-trafficking tenants and thereby allow the Housing Authority to satisfy its obligation to provide "decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437; *accord* N.Y.Pub.Hous.Law § 2.

197. Assume, *arguendo,* that the Escaleras' proposed adjustments to the *Escalera* Decree procedures could reduce the eight months which these procedures currently require, on average, (Aviles Aff. ¶¶ 12, 13) to four months.

198. The Housing Authority still faces the prospect of a holdover proceeding—which requires an additional two to four months to complete—to obtain a warrant of eviction if the tenant refuses to leave, and an Article 78 proceeding by the tenant challenging the Housing Authority's administrative determination. (*Id.* ¶ 5, 16.)

199. Neither of these subsequent judicial proceedings is applicable if the Housing Authority proceeds directly under the Bawdy House Law to obtain a warrant of eviction in the first instance. *See* RPAPL § 749(1) ("Upon rendering a final judgment for petitioner, the court shall issue a warrant directed to the sheriff ... commanding the officer to remove all persons...."); N.Y.Civ.Prac.L. & R. § 7801 ("[A] proceeding under [Article 78] shall not be used to challenge a determination: 1. which ... can be adequately re-

---

19. The Escaleras rely on *Kozlowski v. Coughlin,* 871 F.2d 241 (2d Cir.1989), a pre-*Rufo* decision, in their attempt to impose a strict causality requirement into this prong of the *Rufo* test. In *Kozlowski,* the Commissioner of the New York State Department of Correctional Services ("DOCS") sought to modify a 1983 consent decree which addressed the circumstances under which DOCS may suspend or terminate visitation privileges. *Id.* at 241–42. The decree recognized the rehabilitative benefits of visitation; it did not, however, provide for punitive or disciplinary visitation sanctions absent misconduct between an inmate and a specific visitor. *Id.* at 242. DOCS sought the modification because it contended that more restrictive sanctions were necessary to maintain security and curb rising drug abuse in New York's state prisons. *Id.* In this context, the Court held that the party seeking modification of an institutional consent decree must "show that each change prunes the decree deftly, changing only as much as is required and leaving the ability to obtain the ultimate goal intact." *Id.* at 248. It further held that DOCS failed to satisfy this standard because it did not link the need to curb the growing epidemic of drug abuse in its prisons with the imposition of visitation sanctions. *Id.* at 249. DOCS did not present "a shred of evidence [to] establish[ ] that smuggling during prison visits accounts for a large increase in prison drug trafficking." *Id.* In other words, DOCS' "proof of the [drug] problem's extent, the sources of the contraband and especially the connection between curbing visitation and solving that problem [was] simply inadequate." *Id.* Consequently, the Court affirmed the denial of the requested modifications. *Id.* at 242.

To the extent that the standard articulated in *Kozlowski* is consistent with the "suitably tailored" prong of the *Rufo* test, it does not alter my conclusion that application of the Bawdy House Law to drug-trafficking evictions, rather than making piecemeal alterations to the *Escalera* Decree, is necessary to address the problems raised by the burgeoning drug culture on Housing Authority premises.

Further, the facts of *Kozlowski* are quite distinguishable from those in the instant action. Unlike DOCS in *Kozlowski,* the Housing Authority has proffered ample evidence to show a significant change in facts, and the proposed modification addresses the precise problems which have arisen from the change in facts; there is no missing connection between the proposed modification and the problem being addressed. Consequently, the Escaleras' reliance on *Kozlowski* is unavailing.

viewed by appeal to a court or some other body ...; or 2. which was made in a civil action....").

200. Further, a contested Bawdy House Law proceeding takes only two to three months to complete. (Aviles Aff. ¶ 21.)[20]

201. Therefore, even a more refined proceeding under the *Escalera* Decree fails to compare to the expedited nature of a Bawdy House Law proceeding.

202. With respect to the third *Rufo* factor, the views of the Housing Authority, which I must accord significant weight, *Rufo*, 502 U.S. at 392 n. 14, 112 S.Ct. at 764 n. 14; *see Kozlowski*, 871 F.2d at 247 (recognizing that "intricate questions of institutional structure ... are perhaps best decided by those with greater expertise than judges possess"), unequivocally support the application of the Bawdy House Law rather than merely an adjustment of the *Escalera* Decree procedures.

203. Accordingly, modification of the *Escalera* Decree to allow the Housing Authority to proceed under the Bawdy House Law in the context of drug-trafficking tenants is a suitably tailored modification.

### CONCLUSION

Based on the proceedings and record in this action, the Housing Authority's motion to modify the *Escalera* Decree to allow the Housing Authority to proceed directly under Sections 711(5) and 715 of New York Real Property Actions and Proceedings Law to seek the eviction of tenants who use or acquiesce in the use of their apartments for the trafficking of illegal narcotics is granted.

The Clerk of the Court shall mark this action closed. SO ORDERED:

---

**20.** Although a judgment from a Bawdy House Law proceeding is appealable, *see* N.Y. City Civ. Ct.Act §§ 1701, 1702, a judgment from an Article 78 proceeding also is appealable, *see* N.Y.Civ. Prac.L. & R. § 5701(b)(1), (c). Therefore, any discussion of these further appellate proceedings does not assist in a comparison of the expediency of evictions under these alternative methods.